354 So.2d 297 (1977)
Heflin Mack LANGFORD
v.
STATE.
3 Div. 520.
Court of Criminal Appeals of Alabama.
April 19, 1977.
Rehearing Denied May 24, 1977.
*298 Charles S. Coody, S. G. Culpepper, Jr., and Maury D. Smith, Montgomery, for appellant.
William J. Baxley, Atty. Gen., and Jack Blumenfeld, Asst. Atty. Gen., for the State.
DeCARLO, Judge.
Murder, first degree; life.
An automobile driven by the appellant at a high rate of speed collided with the car driven by a sixteen-year-old, Randall Holt. Holt was killed instantly. The collision occurred on a public highway in Montgomery County, Alabama. The testimony tended to show the appellant was drunk, although he denied this.
A motion for a new trial was filed, considered and overruled, and the appellant has appealed.
The indictment, omitting the formal parts, charged the appellant:
". . . unlawfully and with malice aforethought, killed Randall Wright Holt, by perpetrating an act greatly dangerous *299 to the lives of others, and evidencing a depraved mind regardless of human life, although without any preconceived purpose to deprive any particular person of life by, to-wit: operating a motor vehicle while under the influence of intoxicating liquors or narcotic drugs along a highway and while operating the said motor vehicle under the influence of intoxicating liquors or narcotic drugs did run the motor vehicle in which the said Heflin Mack Langford was driving over, upon, into or against the motor vehicle in which the said Randall Wright Holt was driving and as a proximate cause thereof, unlawfully killed the said Randall Wright Holt.. . ."
In order to sustain these allegations, the State called Jimmy Ray Tillery, who stated that he drove a wrecker for Waldrip's Wrecker Service and that he had known the appellant, Heflin Mack Langford, for about ten months. On June 24, 1975, he had an occasion to go into Langford's bait shop about 5:40 P.M. He purchased a "Coca-Cola" and did not speak to the appellant during the five or ten minutes that he stayed in the store. During this period he noticed beside the counter, a "fifth of whiskey" which was half-full. He also observed the appellant stagger when he walked and smelled a strong odor of alcohol on his breath.
About 6:00 P.M., Langford left the store and then returned after removing the keys from his car. Subsequently, he returned with a sack in his hand and placed it in the car, and then, after locking the store, he drove off in the car. Tillery was parked beside the store at the time. He observed Langford leave in a brown Plymouth and saw him almost hit the wrecker that Tillery was driving. Tillery testified that as the appellant drove away, he swerved from one side of the road to the other.
Walter D. Holt was the father of Randall Holt, the deceased. He stated that on June 24, 1975, he and his wife were having dinner with their son, daughter-in-law, and Randall, at the Arrowhead Country Club. About 7:30 P.M., when the meal was finished, Randall left the others and drove away in his mother's 1972 Oldsmobile. Later when Holt and his wife left Arrowhead they were going to the Montgomery Mall Shopping Center. As they were approaching the area where the collision occurred they noticed the police cars. Holt said he saw his wife's car on the side of the road but after they stopped they were not allowed to go near the scene.
Dr. Ronald Shaw, a licensed physician in Montgomery, Alabama, was on duty in the Jackson Hospital emergency room on the night in question. He examined the body of Randall Holt who was dead when he arrived at the hospital. The cause of death, he said, was a compound basal skull fracture. Dr. Shaw also examined the appellant and noted that he had several small lacerations on the right cheek in addition to bruises on his right and left cheeks and a small laceration on his right arm and two small lacerations on his right hand. An x-ray was made of the appellant's skull but no fractures were identified. Dr. Shaw detected a moderate odor of alcohol on the appellant and that his speech was slightly slurred. It was Dr. Shaw's belief, based on the manner of speech and the coordination exhibited, that this was due to the influence of an intoxicating drug, presumably alcohol.
John Kent Hunt was employed by the State of Alabama, and worked in the "Highway Department Photo Lab." Hunt testified for the State that on June 24, 1975, about 8:00 P.M., he was traveling on U.S. Highway 80, in Montgomery County, when he saw a wrecked car blocking the westbound lane. After stopping his car, he went over to the wrecked car and observed a boy's body in it. Hunt said that the boy appeared to be dead and that he also saw Langford, who appeared to be unconscious, on the ground. He recalled that he smelled alcohol on the appellant and that as Langford regained consciousness he covered him with a blanket. Further, Hunt said that, when the appellant tried to get to his feet, he instructed him to lie still and told him that an ambulance was coming. Hunt left before the ambulance came, but remembered *300 that two girls arrived before he left. It was Hunt's judgment that he was the first person at the scene.
On cross-examination, Hunt stated that he did not see any whiskey in Langford's car, but did see beer cans.
Susan Davidson, a student at Auburn University in Montgomery, stated that on the evening of the collision about 8:10 P.M., she was driving on a street leaving the university. She was accompanied by Sandra Davidson and had stopped at the intersection of the road from the campus and U.S. Highway 80. She then noticed a car on their left traveling extremely fast in swaying, jerking motions. The car was going from lane to lane and in Davidson's judgment, the car was traveling eighty or ninety miles an hour. As the car passed it was swaying from side to side and its tires squealed. Susan Davidson explained that the squealing noise seemed to be ". . . going right with the motion of the car." She continued to watch the car as it passed them and saw it cross the median and go head-on into another car. Susan Davidson explained that the car went down in the dip in the median and seemed to bounce out and land on the front of the car coming in the opposite direction on the other side of the four-lane highway.
During cross-examination, Susan Davidson stated that she did not take her eyes off the car until after the collision.
Sandra Davidson was in the automobile driven by Susan Davidson on the night of June 24, 1975, and her testimony was much the same as that given by her cousin-in-law, Susan Davidson.
S. M. Snead was a photographer for the Alabama State Troopers and was in the vicinity of U.S. Highway 80 and Auburn University in Montgomery on the night in question. He identified certain photographs he made of the scene which were accepted into evidence without objection.
Robert Gardner was a mechanical contractor who, on June 24, 1975, about 8:00 P.M., was at the intersection of Bell Road and U.S. Highway 80. He pulled from that intersection into the Atlanta Highway, heading west, and had only gone "a short ways" when he observed a car traveling " . . . as fast as I have ever seen anything going down the Atlanta Highway. Must have been ninety or a hundred miles an hour." Gardner said that he was positive that the automobile he saw was a Plymouth and that it resembled the car at the scene of the collision. Gardner and his wife had gone to a restaurant to eat supper and approximately an hour had elapsed between the time he first observed the car and when he saw the scene of the wreck.
On cross-examination, Gardner said he could not be positive the car he saw at the scene was the same one he had seen earlier traveling at a high rate of speed.
Don Kimbrough, a State Trooper for the Alabama Department of Public Safety, was called to the scene of an automobile collision on June 24, 1975. On his arrival Kimbrough saw a 1972 Oldsmobile five feet from the edge of the west-bound lane. The Holt boy was in the driver's seat and when he was checked for signs of life there was no pulse. The officer recalled that the Langford vehicle was approximately twenty-seven feet from the edge of the roadway and forty feet from the Holt car. He said the appellant was lying on his back between the two vehicles. According to Kimbrough, the appellant's vehicle had run off the edge of the road and had traveled forty-one feet and struck a milepost marker. It then traveled an additional eighty-three feet before it came back on the road. On entering the road, the vehicle went 183 feet causing skid marks on the pavement. Next it entered the median strip. Kimbrough said the median strip was forty feet wide with a nineteen inch dip or incline in the median where it is lower than the highway. According to Kimbrough, the front end of the appellant's vehicle "bulldozed" a place in one portion of the median and "[t]hen the vehicle became airborne, striking the Holt vehicle which was traveling toward Montgomery. . ." in the west-bound land of the highway. Kimbrough said there was considerable damage to the front portion of the Holt car and that its roof had been *301 "torn away." Further, the officer stated the appellant was alive, and that, after aid was administered, he was taken to Jackson Hospital. Kimbrough testified it took thirty to forty-five minutes to remove Holt's body from the car, and that he too was taken to the hospital.
Kimbrough went to the hospital and while there, rode on an elevator with the appellant who, at the time, was being taken to the emergency room. He described the odor of alcohol as being very strong on the elevator, and said the smell was all over the appellant. Further, Kimbrough said he was present when the blood sample was taken from the appellant and turned over to him. He explained that it was about 12:00 P.M. when he arrived home and placed the sample in the refrigerator. The officer said that the next day he took the sample to the State Toxicologist's Office and gave it to Mary Wisdom.
On cross-examination, Kimbrough stated he did not find any whiskey in appellant's car, but did find some beer.
James Pouncey, a State Trooper with the Department of Public Safety, accompanied Officer Kimbrough to investigate the collision. Pouncey testified that Langford was lying on the ground and there was a moderate odor of alcohol about him. He recalled being present when blood was taken from the appellant and saw the vial of blood given to Officer Kimbrough.
Raymond Richard Zapata was a supervisor for the City Ambulance Company of Montgomery. On June 24, 1975, he went to the scene of the collision. He was accompanied by Robert Smith, the driver of the ambulance. On their arrival, he made a "patient survey" on the appellant. Zapata explained that he put his ears and nose directly on Langford's mouth to determine if the air passage was obstructed. He said he detected the odor of alcohol and that when he asked Langford if he had been drinking, the appellant responded that he had. Zapata stated the odor of alcohol was moderate on the appellant and that, after the extent of his injuries was determined, he was taken to Jackson Hospital.
Robert Smith was the driver of the ambulance which went to the scene of the collision. Smith testified that while he was examining the appellant, he smelled the odor of alcohol. Smith was positive that Langford's eyes were dilated and that he had all the symptoms of being intoxicated.
Alan Craig, on June 24, 1975, was employed as a nurse's aide at the Jackson Hospital. Craig testified that he saw the appellant in the hospital and that Langford was an automobile collision victim. Craig talked with the appellant and could smell the odor of alcohol on him.
Mary Wisdom was a toxicologist with the State Department of Toxicology and Criminal Investigation in Montgomery. She testified that on June 25, 1975, Officer Kimbrough gave her the tube containing the blood sample from the appellant. Wisdom said there was a seal around the stopper with the time "9:45" and the name, "Janet Till", written on it.
Wisdom was asked if she conducted an analysis on the blood sample labeled "H. R. Langford, Mack." At this point, the defense objected and asked the court to allow him to give his reasons outside the presence of the jury. The jury was excused and the defense argued that the chain of evidence had not been completed because Janet Till who had taken the blood from the appellant had not testified and that the appellant had not consented to the test The motion was overruled and Wisdom testified that her analysis of the appellant's blood specimen showed an ethyl alcohol "level of 0.25 grams of per cent [sic]."
Officer Kimbrough, on being recalled, testified that he was present when Janet Till took the blood specimen from the appellant and that she gave it to him. He stated that it was about twelve o'clock when he went home and placed the specimen in the refrigerator.
On cross-examination, Kimbrough said Langford gave Dr. Shaw permission to take the blood specimen.
Thomas A. Cargile was an embalmer and funeral director at Leak Memory Chapel. *302 He testified that on June 24, 1975, he drew a blood specimen from the body of Randall Wright Holt, signed it and placed it in an envelope. Cargile said that the envelope was given to the State Troopers the next morning, but he did not recall the trooper's name.
Don Kimbrough was recalled by the State and he identified the envelope containing the blood sample. He testified that he had picked it up at Leak Memory Chapel, and took it and the sample from the appellant to the State Toxicologist's Office. Kimbrough said he gave them to Mary Wisdom. He did not recall who gave him the specimen at Leak Memory Chapel but did remember it was sealed.
At the end of Officer Kimbrough's testimony, Mary Wisdom, on being recalled by the State, testified that on June 24, 1975, Officer Kimbrough gave her a sealed envelope containing another blood specimen. She said that she performed a chemical analysis of the blood and determined that " . . . it was negative from ethyl alcohol."
C. J. Rehling, the Director of the State Department of Toxicology for thirty years, testified to the educational background necessary for toxicologists to perform their duties. He said he held a "Ph. D." in the field of Chemistry and Biological Sciences, from the University of Wisconsin.
Dr. Rehling testified that during his tenure as State Toxicologist, he had examined the effects of alcohol on the human body. Dr. Rehling stated that a person with ".25 per cent [sic] alcohol in his blood" would not be capable of driving an automobile ". . . safely by any means." He said that control of the motor vehicle operation, steering, controlling of the speed and the vehicle's path relative to traffic would be impaired. Dr. Rehling stated that:
"Our law identifies 0.10, ten one-hundredths per cent [sic] or above that, that all human subjects are under the influence and impaired."
Dr. Rehling added that the basis for this legal assumption was the examination of "thousands and thousands" of human beings by scientists with the ultimate conclusion drawn by the Committee of Alcohol and Drugs of the National Safety Council. It was from this data and through other projects that it was determined that 0.10 percent or more of alcohol in the blood of a human being would impair his operation of a motor vehicle. Dr. Rehling stated he had conducted many of these experiments in the years 1935 through 1937, and had seen and tested many subjects since then. It was on the basis of this knowledge that he arrived at the conclusion that a person with "0.25 per cent [sic] of alcohol in his blood" could not interpret rationally what he sees in traffic and that his judgment and perception would be severely impaired.
David A. Messer was a driver for the Waldrip's Wrecker Service. On June 24, 1975, he went to the scene of the automobile collision on U.S. Highway 80 and pulled an automobile into Waldrip's storage lot. During the trial he identified a photograph of the appellant's vehicle and stated that, about three days after he pulled in the car, Langford came to the storage lot. The appellant stated that he had come to get his belongings. Messer told him that he had placed the beer in "the trailer" and that he should see "the lady on the lot" about his belongings. The appellant then said "what about the whiskey" and Messer responded that he had not seen any.
Effie Cook, the manager of Waldrip's Wrecker Service, testified that she was working during the week of June 24, 1975, when the appellant came to her office. He inquired about personal effects in his car. She stated that an inventory was made of the car's contents and beer was found. This was returned to the appellant and he signed a receipt for it.
Dr. Ronald Shaw was recalled by the State and he testified that the injuries the appellant had sustained would be classified as minor. He explained that a concussion refers to a blow to the skull which causes loss of consciousness and said that if a person is knocked unconscious that would most likely indicate that he had a concussion.
*303 At the completion of Dr. Shaw's testimony, the State informed the court that he was their last witness, and the defense made a motion to exclude the State's evidence as to murder in the first degree. Counsel argued that the State had " . . . wholly failed to present evidence in a depraved mind regardless of human life." The court denied the motion and counsel for the defense moved to exclude the State's evidence on murder in the second degree, and manslaughter in the first and second degree for the same reasons. The court denied this motion also and the defense called Florence E. Langford.
Mrs. Langford was the wife of the appellant and had been married to him for forty years. She stated that on June 24, 1975, she saw her husband at their bait shop about 2:30 P.M. after he returned from Birmingham. Mrs. Langford testified that during the morning she had driven her husband's Plymouth Fury to the shop and that something was wrong with the steering. She said she had driven thirty-five miles an hour and there was a roar in the engine like it was "overpowering." Mrs. Langford left the bait shop about 4:00 P.M. and to her knowledge, her husband had not had anything to drink. She drove home in her own car, a Chevrolet. Her husband called her about 6:00 P.M. and she did not hear from him again until she received a call from the hospital at nine o'clock.
Mrs. Langford said she did not recall what time her husband came in from the hospital but remembered he had a deep cut on his head that had stitches, and cuts on his arm and leg. She stated that he was not intoxicated when he came home.
A. S. Zadanis, a medical doctor, practicing internal medicine, saw the appellant on July 2, 1975. He testified that the examination showed a considerable number of bruises and lacerations involving his right arm and his right leg. When Dr. Zadanis next saw him on August 29, 1975, Langford " . . . complained that he had a considerable degree of nervousness and shaking to the extent that he was unable to work. . . ." The appellant told Dr. Zadanis he could not walk very well because his right leg shook and he had some loss of memory. It was the doctor's conclusion that the appellant obviously had some concussion and brain damage that manifested itself after the accident. According to the doctor, he saw the appellant on October 2, 1975, and he was hospitalized on November 17, 1975. Dr. Zadanis said that he remained in the hospital from November 17, 1975 until December 6, 1975, and that he had not seen him since January 2, 1976.
On cross-examination, Dr. Zadanis said that during the October second visit, the appellant complained of passing blood rectally, and because of this, he inquired about the appellant's alcohol intake. The appellant told him that he drank socially and did not have a drinking problem. Dr. Zadanis said that shortly before his admission in the hospital on November sixteenth, Langford had been drinking heavily. He explained that his condition at the time of his admission was ". . . consistent with that of alcohol depravation, which we call D.T.'s." Dr. Zadanis stated that after a week of confinement, Langford showed rapid improvement, but that this would not exclude the possibility of brain damage.
Heflin Mack Langford testified that he was fifty-seven years old and was the district manager of Liberty National Life Insurance Company. He said he worked for that company for twenty-five years but was now permanently disabled. Langford recalled that on June 24, 1975, he had gone to Birmingham for a district manager's meeting at the home office. He said that he started the trip with his Plymouth but had to return it because, "[i]t was not steering right." After getting his wife's Chevrolet, Langford went to Birmingham, where he stayed for about two hours. He returned to Montgomery approximately 2:30 P.M., and went to the bait shop where he remained talking to his wife for approximately two hours. According to the appellant, his wife left about 4:00 P.M., and he remained until 6:30 or 7:00 P.M. when he closed the business for the day. Langford denied seeing Jimmy Ray Tillery. He said *304 he had only consumed "two beers" that afternoon and denied drinking or having any whiskey at the bait shop. Further, Langford denied placing any whiskey in a brown paper sack and taking it to his automobile that evening.
The appellant recalled that after leaving the shop he proceeded east on U.S. Highway 80, which he described as a four-lane highway with a grass median separating the east and west-bound traffic. He said that he looked at the speedometer and was going between forty-five and fifty miles per hour in a fifty-five miles per hour zone. Langford stated that, just prior to the accident, he was traveling in the outside right lane when he checked his speed and was "well in the limit." According to appellant, he looked up and saw something, which appeared to be a car, come from the college grounds. He said he moved over to the next lane and when he pulled back, he ran off the right side and his car caught the mileage marker. Langford testified that the steering in the car caused him to go off the road. Further, he stated that when he swerved back, he went into the median of the highway and after that, did not remember anything.
Langford recalled being in the hospital but did not remember anyone taking a blood sample from him. The appellant testified that he had been driving an automobile since he was fifteen years old and had never had an accident. He said that he had only two parking tickets during that period of time and in his business he would drive anywhere from thirty to forty-thousand miles a year.
During cross-examination, Langford denied having a drinking problem and denied being a compulsive drinker. He also denied that while he was in Birmingham, Marvin Foster, the manager of the company, gave him the option of either retiring or being demoted. Langford did admit that he and Foster discussed what his retirement benefits would be.
The appellant said he had discussed the steering defect with Mr. Pugh, the man from whom he had bought the car. He recalled that it was about two weeks before the accident that he had a conversation with Pugh, on a Sunday, concerning the steering defect.
On cross-examination, Langford also reiterated that prior to the accident, he was going between forty-five and fifty miles per hour and his car was swaying a small amount.
At the end of the appellant's testimony the defense rested and the State called in rebuttal, Walter F. Pugh. He testified that he had sold the defendant an automobile and that he thought it was in "good shape." Pugh said he never had any conversation at anytime with the appellant concerning the steering mechanism on the automobile.
Marvin Foster was also called by the State and he testified that he was "Vice President, Field Management, Liberty National Insurance Company." He stated that on June 24, 1975, he talked with the appellant and offered him a choice of taking a "job in less capacity" or retirement.
Further, Foster said that the reason for offering Langford the demotion or retirement was "a lack of performance." He explained that "lack of performance" was "pretty broad," but in his estimation the job was not being done.

I
The appellant insists that his conviction of murder in the first degree should be reversed because:
"As a matter of law, the act of intoxicated driving which results in an accident causing death cannot be murder in the first degree."
Counsel concedes that intoxicated driving which results in the death of another may be murder, under Reed v. State, 25 Ala. App. 18, 142 So. 441. However, he argues that Reed v. State, is not authority for holding that such an act was first degree murder because the defendant in that case was convicted of second degree murder. Counsel asserts that the facts surrounding this conviction involve a case of first impression in Alabama.
*305 The appellant in the case before us was not convicted of murder in the second degree but of murder in the first degree. For this reason close attention to the law of murder is necessary. The law of murder in Alabama is found in T. 14, § 314, Code of Alabama 1940, Recompiled 1958. The instant section reads:
"Every homicide, perpetrated by poison, lying in wait, or any other kind of wilful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or the attempt to perpetrate, any arson, rape, robbery, or burglary, or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed; or perpetrated by any act greatly dangerous to the lives of others, and evidencing a depraved mind regardless of human life, although without any preconceived purpose to deprive any particular person of life, is murder in the first degree . . . ." [Emphasis added.]
As this section indicates, murder in the first degree is divided into four classes. Mitchell v. State, 60 Ala. 26; Fields v. State, 52 Ala. 348.
The indictment in the present case charges murder in the first degree as defined in the fourth class of T. 14, § 314, supra.
In the case of Mitchell v. State, supra the Alabama Supreme Court observed:
". . . that this fourth class omits all mention of the words, malice aforethought, formed design, willful, deliberate, malicious, premeditated, unlawfully and maliciously, some of which are found in all the common-law definitions of murder, save that from universal malice. If a blow or injury, intentionally aimed and inflicted on a particular person, the act being greatly dangerous to life, and itself evidencing a depraved mind regardless of human life, be ruled to be murder in the first degree, then this clause fixes a much lower standard of evidential requirement, than do the classes one and three above mentioned. And this is all the more manifest, when we reflect that this clause dispenses with all preconceived purpose to deprive any particular person of life. A blow or injury, unlawfully and intentionally aimed and inflicted on a person, by an act greatly dangerous to life, and actually producing death, under such circumstances as to evidence a depraved mind regardless of human life, could not be inflicted without a preconceived purpose to deprive some particular person of life."
The court went on to say that:
"By universal malice, we do not mean a malicious purpose to take the life of all persons. It is that depravity of the human heart, which determines to take life upon slight or insufficient provocation, without knowing or caring who may be the victim. The supreme depravity shown in this so-called universal malice, is considered as the equivalent of the strong adjectives, willful, deliberate, malicious, and premeditated, which characterize the first class of murder in the first degree."
Sir William Blackstone speaking of universal malice, 4 Cooley B1. Comm. * 199 (4th ed. 1899), said:
"Neither shall he be guilty of a less crime, who kills another in consequence of such a willful act as shows him to be an enemy to all mankind in general; as going deliberately, and with an intent to do mischief, (b) upon a horse used to strike, or coolly discharging a gun among a multitude of people. (c) So, if a man resolves to kill the next man he meets, and does kill him, it is murder, although he knew him not; for this is universal malice." [Emphasis added and footnotes omitted.]
In State v. Massey, 20 Ala.App. 56, 100 So. 625, this court stated that the fourth class of murder in the first degree:
". . . was designed to include those cases also in which death is produced by acts putting the lives of many in jeopardy, under circumstances evincing great depravity and utter recklessness in regard to human life."
*306 Some of the instances of universal malice mentioned in State v. Massey, supra, are where:
". . . One may shoot into a crowd merely for the purpose of producing alarm and not having the intent to kill any particular person, although at the imminent hazard, as he knows, of killing some one. One may drive a high-powered automobile along a crowded street of a large city at a high rate of speed into a crowd of children playing in the street, killing one of them, but without the intent to kill any particular person, knowing that such reckless act will probably result in death. One may ride an unruly horse in a run into a crowd of people without the intent to any particular person, knowing that the horse is likely to run over and trample to death some one or more persons. Again he may open the drawbridge of a railroad company with the intent to kill the passengers or for the sole purpose of destroying the property of the railroad company."
The definition given in T. 14, § 314, supra, of this fourth class of murder in the first degree, brings the instances enumerated within the realm of the principles stated. It shows that this fourth class of murder was intended to embrace homicides committed with universal malice.
In State v. Trott, 190 N.C. 674, 130 S.E. 627, the court stated:
". . . Huddy says: `The act of a motorist may fall within the cases of murder in such a manner as to evince a depraved mind, as where one voluntarily becomes intoxicated while driving a car, and then drives on the streets of a city at a high rate of speed, heedless of pedestrians or of his acts. To make a case of murder against a motorist exceeding the speed limit, it should appear that such conduct was directly perilous to human life or that human life would probably be endangered thereby. Thus, if one in charge of a car so operated it where he saw people on the street and in danger, and if he so operated his car where he knew it to be probable that people were in the way, malice may be implied.' Automobiles, 7th ed., 993, sec. 917. See, also, The Law of Automobiles by Berry, sec. 1758."
The court said in State v. Massey, supra, that:
". . . Voluntary drunkenness does not excuse crime, yet its excessiveness may produce such a mental condition as to render the intoxicated person incapable of forming a specific intent, and, when the intent is of the essence of the crime, drunkenness as affecting the mental state of the accused becomes a proper question for the jury in determining the question of intent. Fonville v. State, 91 Ala. 39, 8 So. 688."
The court went on to say in State v. Massey, supra:
". . . The same doctrine which permits the jury to consider evidence on voluntary drunkenness in determining the question of intent is applicable in deciding whether or not there was an operation of the accused's mind, a result of the depravity of heart, which determined to take life without sufficient provocation, without knowing or caring who might be the victim, or whether he was knowingly and consciously guilty of doing a grossly negligent act dangerous to the lives of others, `evidencing a depraved mind regardless of human life, although without any preconceived purpose to deprive any particular person of life.'"
In this case, the main question is the manner in which the defendant was operating his car at the time he struck the deceased's car. Was this an ". . . act greatly dangerous to the lives of others, and evidencing a depraved mind regardless of human life, although without any preconceived purpose to deprive any particular person of life. . . .?" The appellant attempts to justify his act by maintaining that the steering in his car was defective. He said that just before the collision his car swerved and hit a milepost marker that caused his vehicle to go into the median and ultimately crash into the deceased's car. *307 The appellant denies that he was intoxicated but admits that he had two "cans" of beer before leaving his place of business.
There was testimony from several witnesses that the accused was driving between eighty and one-hundred miles an hour just prior to the accident. There was also testimony that the alcohol content in accused's blood was 0.25 percent, which was more than sufficient to impair his operation of a vehicle in a safe manner. Further, there was testimony that just prior to the collision the appellant's vehicle was seen being driven in an erratic, swerving manner. The testimony also showed the vehicle was going from one side of the road to the other and the collision occurred on a part of the highway used by the traffic going in the opposite direction.
The facts in the present case indicate that the collision was not the typical automobile accident where a driver makes a gross error of judgment and is tried for manslaughter. Rather, the conduct surpasses the usual vehicle manslaughter case and demonstrates characteristics of wanton conduct, and an abandoned and malignant heart.
It would be idle to say that Langford's reckless driving was unintentional or that he did not know the speed of his car was excessive when the collision occurred. Indeed, it is reasonable to infer that he was conscious, that his act was greatly dangerous to the lives of others and evidenced a depraved mind regardless of human life.
The jury had sufficient evidence from which to find Langford guilty of the fourth class of murder in the first degree under T. 14, § 314, supra.

II
The appellant asserts that he was deprived of his right to effective counsel guaranteed by the Constitution of the United States and the Alabama Constitution, because retained counsel failed to render reasonably effective assistance.
No all encompassing definition of effectiveness or ineffectiveness of a lawyer's assistance to a client exists. The Supreme Court of Alabama in Taylor v. State, 291 Ala. 756, 287 So.2d 901, stated:
". . . Effective assistance does not mean counsel is without error. What may later seem to be error may have been trial tactic at the time. Further, conviction of a client does not prove the lack of skill or zeal on the part of counsel." [Citations omitted.]
The alleged inadequate representation by trial counsel does not appear in the record but is suggested in counsel's brief on appeal. The Alabama Supreme Court in Tillis v. State, 292 Ala. 521, 296 So.2d 892, said: ". . . [B]efore an alleged error of inadequate representation will have any persuasiveness there must be specific acts of inadequacy appearing in the record and a showing as to how inadequate representation may have affected the verdict."
The appellant claims the action or lack of action marking trial counsel's inadequacy is pointed up in the following instances:
(1) That trial counsel certified in a "Waiver of Arraignment" form, that the case under consideration was a non-capital offense. Counsel on appeal maintains this certificate demonstrated trial counsel's failure to understand the nature of the charge and his lack of knowledge of the law. Further, he said that the trial counsel failed to properly advise his client about waiving important fundamental rights when he made the waiver of arraignment. Appellant's counsel argues that it is difficult to imagine how anyone could think the offense charged to the appellant was anything but a capital offense under the law.
(2) Counsel on appeal said trial counsel failed to understand the gravity of the charge against the appellant and this ineffectiveness was demonstrated during trial counsel's questioning of defense witness, Dr. A. S. Zadanis:
. . . . . .
"Q Did you consult with Dr. Cox concerning Mr. Langford?
"A Yes.

*308 "Q In those consultations with him did Dr. Cox ever indicate to you any evidence that this man had a depraved mind?
"A No."
Counsel argues this was a stark indication that trial counsel never understood the nature of the charge against his client. Further, counsel on appeal explains the offense charged against this appellant involves a question of whether or not his act, and the circumstances surrounding that act, evidenced a conclusion that he did those acts without regard to human life when he drove an automobile while intoxicated. Counsel insists that no amount of zealousness can overcome lack of one's understanding of the law and any attempt at a defense could only be pro forma.
(3) Counsel on appeal conceded that the appellant's intoxication was a question for the jury. He points out that voluntary drunkenness may be so extreme as to render impossible the specific mental operation which was an essential element of the act charged against this appellant. However, counsel argues that not only did trial counsel fail to raise these issues, but in the face of overwhelming testimony, tried to show that the appellant was not intoxicated.
(4) Counsel on appeal insists that when trial counsel failed to except to the court's oral charge when such an instruction amounted to a directed verdict of first degree murder, such failure resulted in the non-preservation of the appellant's right to appeal. Further, he said that the written charges were merely "canned" charges applicable to a typical murder case, and these charges had nothing to do with the issues in this case. Counsel said this further demonstrated the trial counsel's failure to understand the charge against the appellant.
(5) Counsel on appeal insists that trial counsel should have called character witnesses to testify on behalf of defendant. He maintained that it is inconceivable that an insurance executive with a life insurance company for twenty-five years, with above average performance, would not be wellknown and respected in the community where he lived.
Counsel on appeal insists that, standing alone, none of these instances cited above, demonstrated in and of themselves, an inadequacy of counsel. He maintains, however, that, when coupled with the others, this failure to call character witnesses in a wellpublicized criminal proceeding was one more indication that counsel had failed to render the necessary effective assistance required.
Appellate counsel characterized the appellant's trial in the lower court as more of an inquisition than an unbiased, adversary proceeding. He maintained that defects of the attempted defense were apparent and instead of attempting to insure the defendant's trial was conducted fairly, State officials capitalized on trial counsel's mistakes and lack of understanding of the law. Such a conviction, he insists, cannot be allowed to stand.
This court in Gore v. State, 45 Ala.App. 146, 227 So.2d 432:
". . . [T]he duty of counsel, retained or appointed, in a criminal trial, . . . . is to prevent the trial from being or appearing to be `a farce or a mockery of justice.'"
In Harried v. United States, 128 U.S.App.D.C. 330, 389 F.2d 281, the court wrote that the burden is on the appellant to establish his claim of ineffective assistance of counsel. The court went on to say that such a claim must be assessed in light of the entire record.
In Herring v. Estell, 5 Cir., 491 F.2d 125, the court stated:
". . . The governing standard is reasonably effective assistance. One method of determining whether counsel has rendered reasonably effective assistance is to ask whether the proceedings were a farce or mockery. A farce-mockery test is but one criterion for determining if an accused has received the constitutionally required minimum representation (reasonably effective assistance)." [Citations omitted.]
In Taylor v. State, supra, the Supreme Court of Alabama said that:

*309 "The `mockery of justice' rule is frequently cited as a minimum standard of competence and efficacy. Other factors often mentioned include the fairness of the trial as a whole, the reasonableness of counsel's assistance, loyalty to client, good faith, and the nature and extent of counsel's pre-trial preparation and opportunity for conference." [Footnotes omitted.]
Judge Cates in Gore v. State, supra, cited United States v. Cariola, 3 Cir., 323 F.2d 180, for the following catalog of factors:
"(1) Member of bar in good standing;
(2) loyalty to client;
(3) good faith;
(4) service to best of ability; and
(5) character of service comports with justice."
In the instant case, the appellant was represented at trial by counsel who was a member of the Alabama Bar in good standing, and who during the trial cross-examined twenty-two of the State's twenty-four witnesses. Under the facts of this case, which were overwhelming, to say the least, his examination was reasonably effective. During the trial he made numerous objections and challenges to evidence offered by the State.
At the completion of the State's evidence, trial counsel made a motion to exclude. When this motion was overruled, witnesses were called for the defense and the defendant testified in his own behalf. He elicited from the defendant testimony, which, had it been believed by the jury, would have led to his acquittal, or a conviction for a lesser offense.
Upon completion of all the testimony and before the case was submitted to the jury, he requested some thirty-five charges and twenty-nine were given. After the jury's verdict of guilt and judgment was pronounced, he made a prompt motion for a new trial which was eventually denied.
In our judgment, Langford's conviction was a result of the jury's disbelief in his testimony and the evidence he offered. It is hard for us to believe that another attorney would have been more effective under these circumstances. Effective and competent counsel does not mean that a trial attorney was errorless throughout the conduct of the trial and certainly not one judged ineffective by hindsight. Effective counsel is one who is likely to render reasonably effective assistance. Under the facts of this case, counsel rendered the necessary assistance.

III
Appellant complains that evidence of the blood-alcohol level of the blood specimen taken from the appellant was improperly admitted for two reasons. First, because procedures used by the authorities to preserve the blood specimen taken from the appellant were wrong. Appellant argues that the sample was placed in a container without adding any preservatives and was kept without refrigeration for more than two hours. He maintained that because no precautionary measures were taken to preserve the blood specimen, the results of the blood analysis would be erroneous. The second reason asserted is that the State failed to prove the continuity of possession of the blood specimen. He argues that the blood specimen was taken at approximately 9:45 P.M., on June 24, 1975, and that some two hours later it was placed in Officer Kimbrough's refrigerator at his home. Counsel points out that Kimbrough did not deliver the specimen to the State toxicologist until 4:00 P.M., the following day. He insists that because of these facts and the fact that Officer Kimbrough did not testify, that the vial containing the blood had not been tampered with, the evidence was improperly admitted.
At trial, defense counsel did object to the introduction of the blood specimen on the grounds that the State failed to prove the continuity of possession and thus preserved this claim of error for review. However, we have been unable to find in the record, any objection pointing up the fact that the procedures taken by the State in preserving the appellant's blood sample were objected to on the ground it was improperly preserved. No evidence was offered *310 that showed that the failure to refrigerate the specimen or use preservatives in any way affected the results of the analysis.
Without objection on this specific point, this court is without authority to review this claim of error.
The basic reason for establishing the identification and continuity of possession of an article offered into evidence is to show its authenticity and give assurance that no one has tampered with this article. Powell v. State, 47 Ala.App. 582, 258 So.2d 923.
In the present case the testimony was sufficient to establish the chain of custody of the blood specimen. The facts show that Officer Kimbrough was present when Till extracted the blood from the appellant and that the specimen was immediately turned over to him. It is also shown that he arrived home about midnight and that he placed the specimen in his refrigerator. Kimbrough stated that from the time Till handed him the specimen until he turned it over the the toxicologist, he alone had possession of the vial. There was also evidence that the vial containing the specimen had been sealed and the name, "Janet Till," and time, "9:45," were written on it.
The chain of custody was sufficiently established and the introduction of the blood specimen was proper. Kimbrough's storage of the blood in his home refrigerator and leaving it unattended would not constitute the necessary break in the chain of possession. Accord, Dennison v. State, 259 Ala. 424, 66 So.2d 552. If a weak link in the chain of custody is assumed arguendo, it would present a question of credit and weight, rather than admissibility. King v. State, 45 Ala.App. 348, 230 So.2d 538; McClary v. State, 51 Ala.App. 30, 282 So.2d 379.

IV
The appellant insists that he was deprived of his right to the effective assistance of counsel on appeal because the court reporter failed to record the closing arguments at trial.
In Alabama, no duty exists to transcribe the entire argument of counsel. T. 13, § 262, Code of Alabama 1940, Recompiled 1958; Browder v. State, 54 Ala.App. 369, 308 So.2d 729.
In the present case, the trial counsel did make several objections to the argument by the State, and these were taken down.
Since no legal requirement exists in Alabama for reporting counsel's arguments, and in view of the fact trial counsel's numerous objections during the State's argument were recorded, we fail to see how this appellant was denied due process or equal protection of the law.

V
The appellant has raised four other contentions in his brief, but in no instance of claimed error do we find in the record an objection or adverse ruling preserving those points. Generally, in order to preserve some point of claimed error, an objection or some adverse ruling must be made before that point can be reviewed on appeal. Daniels v. State, 53 Ala.App. 666, 303 So.2d 166; Edwards v. State, 287 Ala. 588, 253 So.2d 513; Pugh v. State, 247 Ala. 535, 25 So.2d 417.

VI
The appellant requested thirty-five written charges and twenty-nine were given during the court's oral instruction. Two of the six requested written charges by the appellant that were refused were affirmative in nature, and the four remaining were covered by the court's oral charge and the charges given at the request of the defendant.
At the end of the court's oral charge, the State and the defense announced they were satisfied with the charge.
After a close examination of the court's oral charge, and the twenty-nine charges given at the request of the defendant, it is our judgment that the six charges requested by the defense were properly refused. Gosa v. State, 273 Ala. 346, 139 So.2d 321.
*311 We have carefully read and examined this record in its entirety many times and have found no error.
AFFIRMED.
All the Judges concur.
BOOKOUT, J., files additional opinion in support of judgment.
Tyson, P. J., joins in additional opinion.
BOOKOUT, Judge, concurring specially:
I concur in the instant opinion, but would expand upon Section I thereof.
While an automobile is not per se a deadly weapon, when driven properly, it may nevertheless be used as a deadly weapon the same as a gun, or a knife or a club may be improperly used. There is no doubt that a person who kills by deliberately driving his car into or over a victim, intending to injure or kill, may be indicted and tried for first degree murder. Blackwell v. State, 264 Ala. 553, 88 So.2d 347 (1956). The problem arises in this case as to whether driving a vehicle in a grossly and wantonly negligent manner may be the subject of a first degree murder prosecution and conviction.
The fourth class of first degree murder under Title 14, § 314, Code of Alabama 1940, requires the perpetration of an act: (1) greatly dangerous to the lives of others, (2) evidencing a depraved mind regardless of human life, (3) although without any preconceived purpose to deprive any particular person of life.
There is no evidence that the appellant drove with any preconceived purpose to deprive the victim of life, therefore, our inquiry is directed at (2) and (3), supra. The instant case does not clearly fall within the traditional examples set out in the instant opinion and in most decisions on this point of law, i. e., deliberately driving into a crowd, shooting into a crowd, wrecking a passenger train, etc. To determine that the conduct of a driver falls within the fourth class of first degree murder, a number of factors should be considered, such as, but not limited to the following:
1. Where the accused was driving; whether in a sparsely populated area or a heavily populated area.
2. How the accused was driving; whether speeding or in a reckless manner.
3. Road and weather conditions, including visibility.
4. Degree of intoxication of the accused.
5. Physical and mental condition of the accused.
6. The mechanical condition of the automobile of the accused (and of the victim if his automobile was involved).
7. Possibility of an intervening act causing the collision.
8. Contributory negligence of a victim.
After considering the above factors and any other pertinent factors, the question of foreseeability of injury becomes important. In line with the traditional examples of universal malice, it would be easy to decide the case if the appellant had deliberately started driving in the wrong direction in the oncoming lane of traffic, evidencing a preconceived notion to run everyone off the road he approached or else run over them. The same would be true if he had, upon seeing numerous vehicles and pedestrians on a crowded city street, aimed his car in their direction and accelerated to an unstoppable speed. In those examples, the consequences of the accused's contemplated act are obvious, and he nevertheless disregards the apparent consequences and goes full speed ahead.
Here, instead, was a man, possibly distraught over the threatened loss of his job; who began drinking; finally got in his car; got up to 80 miles per hour or more on a wide four lane stretch of highway, divided by a median strip; who lost control of his car; crossed the median and ran head-on into the victim's car. This raises certain questions. Was the death of someone the natural and foreseeable consequence of his getting behind the steering wheel while intoxicated? Considering the condition of the roadway, whether it was conducive to speed; the presence or absence of heavy traffic; the sparseness of residential and *312 business population of the area; weather conditions; the time of day (or night) and other pertinent factors, can it be determined that appellant should have known that someone's death was likely to occur if he attempted to drive in his intoxicated condition?
There have been several cases in Alabama where indictments for first degree murder were returned in similar circumstances, but we have been unable to find a conviction for first degree murder in such a case. Second degree murder verdicts have been returned in a few instances, but manslaughter seems to generally prevail. This appears to be the first case reported in this state where a first degree murder conviction resulted under the universal malice theory from driving while intoxicated.
In Reed v. State, 25 Ala.App. 18, 142 So. 441, cert. denied 225 Ala. 219, 142 So. 442 (1932), the appellant was charged with first degree murder under an indictment almost identical to the one in the instant case. There the appellant was intoxicated and drove his car through the city streets of Birmingham at speeds of 40 to 65 miles per hour. While turning a corner at that speed, he ran over and killed a pedestrian on the sidewalk. The appellant was there convicted of second degree murder and sentenced to fifteen years imprisonment. The Alabama Court of Appeals approved the following charge given to the jury by the trial judge:
". . . `* * * If a person driving an automobile along the public highway knew that he was intoxicated, and, with that knowledge and the knowledge of other persons present on the highway, should proceed to drive the car in a highly reckless manner and operate the car in such manner as to be greatly dangerous to the lives of others and thus evidencing a depraved mind and regardless of human life, then you might consider that fact in determining whether or not the operator of the car was guilty of murder.' . ."
In Hyde v. State, 230 Ala. 243, 160 So. 237 (1935) the accused was driving while intoxicated and drove his car in an extremely reckless manner, "zig-zagging his car from one side of the road to the other," forced a traveler off the road, and finally collided with the rear of another car in which two young ladies were traveling, causing it to turn over and catch fire. The two young ladies died from the burns. The appellant was charged with first degree murder, convicted of second degree murder and sentenced to twenty-five years imprisonment. The Alabama Supreme Court found the evidence presented a question for the jury, and the proof was sufficient for submission to the jury on the question of the appellant's guilt of second degree murder, citing as authority, Reed, supra.
In Williams v. State, 30 Ala.App. 437, 7 So.2d 511 (1942) the Alabama Court of Appeals upheld the second degree murder conviction of the appellant. There the appellant, while intoxicated to an undetermined degree, drove his car on a highway on Sand Mountain at 50 miles per hour, ran into the rear of two cars ahead of him, then the side of an oncoming vehicle, causing the death of a passenger. The Court of Appeals citing Reed and Hyde, supra, found ample evidence from which the jury could find that the appellant, ". . . `was conscious of his acts, conscious of the impending danger surrounding him, and of the probable results of his acts, and then with a reckless indifference to the probable consequences of his acts, brought about the collision and death of the deceased.' . . ."
In Berness v. State, 38 Ala.App. 1, 83 So.2d 607, affirmed, 263 Ala. 641, 83 So.2d 613 (1953), the appellant, while drunk and driving "pretty fast," crossed the entire highway, struck and killed a crippled girl walking on the opposite shoulder of the roadway. Although reversing on another ground, the Court of Appeals, citing Reed, Hyde and Williams, supra, held:
"It is well settled under our decisions that where the accused is himself the driver of an automobile and drives it in a manner greatly dangerous to the lives of others so as to evidence a depraved mind regardless of human life, he may be guilty of *313 murder in the second degree if his antisocial acts result in death of another, and this though he had no preconceived purpose to deprive any particular human being of life. Under such circumstances his acts are unlawful and without legal excuse, and malice may be inferred therefrom. . . ."
In Wright v. State, 41 Ala.App. 684, 149 So.2d 835 (1963) the appellant was indicted for first degree murder, convicted of second degree and sentenced to sixteen years imprisonment. There the appellant and a friend, after drinking at a tavern, decided to race each other in their trucks. " . . . Generally driving one behind the other but passing each other . . . and running through several red lights, they drove through Jasper at speeds estimated from 50 to 80 miles per hour . . ." On the western outskirts of Jasper, appellant's truck ran into the right side of an automobile of a third party, causing his death. The Court of Appeals affirmed, quoting the above quotation from Berness, and citing Reed, Williams, and Hyde, supra.
Although a case of first impression, and while a very close question of whether Langford's gross and wanton misconduct rises to the degree necessary to show universal malice by evidencing a "depraved mind regardless of human life," the above cited authorities would indicate that the evidence was sufficient to present a jury question in that regard. The jury had a right to pass on the truth and sufficiency of the appellant's explanation of the collision, Williams, supra. They did not believe him, and we cannot say they were wrong under the evidence presented. This case, however, should be affirmed with one caveat to prosecutors. It is not every case of reckless driving that rises to the degree of wantonness that would support a conviction for first degree murder. Where the overwhelming majority of cases are disposed of on manslaughter charges, but a case on almost identical facts is tried under Title 14, § 314, supra, because of notoriety or publicity, a close question of selective prosecution may arise under the equal protection clause.
To quote from McGhee v. State, Ala.Cr.App., 333 So.2d 865 (1976):
". . . this appears to be an area which is ripe for legislative action. A statute which speaks specifically to the elements of vehicular homicide while intoxicated, along with an appropriate penalty section, would be an immense improvement over the present attempts to prosecute for such conduct under our traditional murder statutes."
TYSON, P. J., joins in the above.