MAIN, Judge.
James Linden Sheffield was indicted for two counts of reckless murder; the deaths occurred as a result of arson. He was convicted of reckless murder, as charged in the indictment, for the death of Charles Edward Morrow, Jr., see § 13A-6-2(a)(2), Ala.Code 1975 (count I), and the lesser-included offense of reckless manslaughter for the death of Charles Edward Morrow III, see § 13A-6-3(a)(l), Ala.Code 1975 (count II). The circuit court sentenced him to 600 months’ imprisonment on the murder conviction and to 204 months’ imprisonment on the manslaughter conviction, the sentences to run consecutively. The court ordered him to pay costs, a crime victim’s compensation assessment, and restitution. After sentencing, Sheffield’s appointed trial counsel withdrew, and Sheffield’s retained appellate counsel filed motions for a new trial and for a judgment of acquittal. The parties agreed to extend the time for the court to rule on the motions. See Rule 24.4, Ala.R.Crim.P. After conducting a hearing, the court denied the motions. This appeal followed.
The evidence at trial revealed the following facts. On December 10, 2003, at around 8:00 a.m., a small, one-story house on County Road 802, just off of County Road 323, near U.S. Highway 82, in Ma-plesville burned to the ground. Charles Edward Morrow, Jr., also known as “Chucky,” and his three-year-old son, Charles Edward Morrow III, who was nicknamed “Main Man,” lived in the house, and died as a result of the fire.[1] The autopsies showed they died of smoke inhalation and thermal burns. The toxicology report indicated Chucky had Xanax and marijuana in his system when he died.
Floyd Smitherman, a customer at a nearby convenience store, GGG’s, first noticed the fire. As Smitherman entered the store, he spotted a small fire in the distance. By the time he left the convenience store and walked to his pick-up truck, the fire had increased in size, so he drove in the direction of the fire. He found a house that was fully engulfed in flames. An unknown man in a pick-up truck, who was near the burning house, told Smitherman he was going to diive into Maplesville to get help. Smitherman continued to watch the fire consume the house before deciding that no help was coming. He drove back to GGG’s and asked the clerk to call the fire department. The 911 emergency call reporting the fire came from the convenience store at around 7:57 a.m.
Harold Morrow, Chucky Morrow’s cousin, received a telephone call the morning of the fire, informing him of the fire. He drove a quarter of a mile from his house to Chucky’s house and found it consumed by flames, and his cousin was nowhere to be found. He went to Sheffield’s home, which was located a block and a half away from Chucky’s house, to see if Chucky might be there because Sheffield, who was nicknamed “Scoff,” and Chucky had been friends for several months and were frequently together. According to Harold Morrow, they both owned pit-bull dogs and shared an interest in those types of dogs. When Harold Morrow arrived at Sheffield’s house, although a pit-bull dog was tied to the porch, no one came to the door when he knocked. He went back to Chucky’s house and was later joined there by Sheffield and another friend.
*613 Lt. Freddie Mayfield, a detective with the Clanton Police Department, who was chief of police for the Maplesville Police Department in December 2003, arrived at the scene around 8:03 a.m. When he arrived, the house was almost completely burned. Officer Mayfield also explained that several days before the fire, on December 5, 2003, he took an incident and offense report from Sheffield, who listed his address as 336 County Road 323, Ma-plesville, regarding the theft of eight pit-bull puppies, valued at around $2,400. (C. 227-28; R. 68-70.)
Chilton County Sheriff Kevin Davis, a police officer for the Maplesville Police Department, who worked in the narcotics division in December 2003, also testified about the report of the stolen puppies that was filed by Sheffield on December 5, 2003. Officer Davis testified that, after filing the report earlier that day, Sheffield came to the police department upset and made a statement to him that Chueky Morrow was getting away with stealing his puppies and selling drugs. According to Officer Davis, Sheffield threatened to burn Chueky Morrow’s house. More particularly, Officer Davis testified Sheffield said: “ ‘I’m so mad about my dogs, I am a good mind to screw his doors and windows shut and set his house on fire with him in it.’ ” (R. 85). Officer Davis told Sheffield there was no reason to kill someone over some dogs and suggested Sheffield buy drugs from Chueky Morrow as a confidential informant. Sheffield agreed to the arrangement and effected a controlled buy a few days later on December 8, 2003.
Ida Morrow, Chueky Morrow’s mother and Main Man Morrow’s grandmother, testified that, after she heard about the fire, she learned that Chucky’s pit-bull dog was at Sheffield’s house. She had given her son $60 to purchase that particular pit-bull dog, which she claimed Sheffield had also wanted to buy. The day of the fire, she called Sheffield and told him to bring her the dog or pay her $60 for it. Sheffield brought her $60 that day.
Harold Morrow stated that both he and Sheffield had been at Chucky’s house the evening before the fire. Harold Morrow explained that when he left Chucky’s house at around 9:00 p.m., Sheffield was still there along with Chueky and Main Man, and everyone was getting along and everything seemed fine. Jerry Joe Gordon, who lived next door to Chueky Morrow, also testified that he saw Sheffield with Chueky and Main Man on the evening before the fire, and they appeared to be on friendly terms. Ida Morrow also stated that Sheffield and her son were friends. She indicated that she knew of no dispute between the two of them and never saw any signs of any problems between them.
Tiffany Cooper, who was Sheffield’s girlfriend in December 2003, also testified to similar facts leading up to the fire. She said on December 5, 2003, Sheffield was mad about some stolen puppies and filed an incident report. According to Cooper, Sheffield believed Chueky had taken the puppies. After Sheffield filed the report, they went to Demopolis.
Cindi Tremaine, the mother of Cooper’s friend, Lisa London, and in whose home Sheffield and Cooper resided in Maples-ville in December 2003, testified that before Sheffield went to Chucky’s home on the night before the fire, he told her that he was going over there to see if he could get information from Chueky about the stolen puppies because he believed Chueky had taken the puppies.[2] She stated that *614 Sheffield told her that he was going to give Chucky some Xanax pills in order to get him to talk. London also testified that Sheffield told her that he thought Chucky had taken the puppies and that he was going to give Chucky some Xanax that night. Records from a doctor’s office in Demopolis were introduced into evidence that showed that Sheffield had refilled a prescription for Xanax on December 6, 2003.
Deputy Fire Marshal Jay Edwards investigated the scene after the fire. He determined that the fire had originated in the back bedroom of the approximately 50-70 year-old house, which still had its original electrical wiring. There was an electric space heater in the back bedroom. Deputy Edwards brought in dogs that were trained in detecting the presence of an accelerant, and none was detected. Deputy Edwards testified that the remains of an adult and a small child were found. He was, however, unable to determine the cause of the fire.
Deputy Edwards first questioned Sheffield about the fire shortly after the fire, when Sheffield came to the police station voluntarily. Sheffield was questioned because of the statement he made to Officer Davis in December 2003, threatening to burn Chueky’s house in retaliation for Chucky having stolen some pit-bull puppies from him. During his first statement, Sheffield denied any involvement in the fire but showed Deputy Edwards where a fire could be set that would burn down Chucky’s house. The location Sheffield indicated was where the actual fire originated. After the first interview, Deputy Edwards placed the case on inactive status because he concluded there was not enough evidence to present it to a grand jury.
Cooper stated that she and Sheffield dated for over five years and that they had a daughter together on January 26, 2006. Cooper and Sheffield were living together in December 2003 and were staying in Tremaine’s home. Cooper did not recall anything unusual about the evening before or the morning of the fire except that Sheffield had on blue jeans when they woke up in the morning and she did not remember him having them on when they went to bed the night before. Cooper and Sheffield moved from Maplesville to Mar-engo County on December 26, 2003.
Several months after the fire, Cooper told Sheffield that it was “bad enough that Chuck[y] died, but it made it even worse that there was a little child in the house that got killed.” (R. 122.) According to Cooper, Sheffield replied that “it wouldn’t have mattered because he would have grown up just like his father.” (R. 123.) Cooper stated that one time in February 2006, after the fire and after their daughter was born, she and Sheffield discussed spirituality. Specifically, Cooper testified as follows:
“A. We were just having the discussion about if something happened I would be able to get to see my child again in heaven. And he made the comment that he wouldn’t be going to heaven because he had killed somebody.”
(R. 121-22.) Cooper and Sheffield broke up in February 2007. Cooper provided a statement to Deputy Edwards in late July 2007.
Brandye Slocumb testified that in De-mopolis in January 2007, in the presence of Joe Courtney, her boyfriend at the time, and Erica Criswell, Sheffield had said “if you kill somebody, you have to be able to live with what you’ve done.” (R. 129.) *615 She testified that Sheffield never specifically said that he had killed anyone. Slo-cumb also gave a statement to Deputy Edwards in July 2007.
At trial, Erica Criswell, who was dating and living with Sheffield in July 2007, testified that he told her he did not know Main Man was in the house on the night of the fire. She had heard rumors from other people concerning Sheffield’s possible involvement in the fire but had not heard that directly from him. He told her only that he had been investigated about his involvement with the fee.
Criswell, however, gave a statement to Deputy Edwards in July 2007, in which she stated that Sheffield confessed to her that he had set Chuck/s house on fire. At trial, Criswell explained that Sheffield had not told her that he set the house on fire. At trial, she stated that, during a telephone call with Sheffield while he was in jail, he talked to her about going to a doctor in Demopolis to get a prescription for Xanax filled. Criswell testified that, in addition to the telephone calls, she also visited Sheffield several times while he was incarcerated. She also wrote him a letter that was introduced into evidence in which she wrote that she had provided a false statement to law-enforcement officials because of the threats they were making. Specifically, in that letter, she explained why she had made the false statement:
“Those people were telling me that I was going to prison for withholding state’s evidence. And that they were removing my children for their safety. On top of all that I kept telling all 8 of them that I needed my medicine that I was suppose to be on b/c I couldn’t think. They kept right on telling me all that they wanted me to say. They even showed me the police report from years ago. For 3 or more hours I kept telling them I didn’t know until finally they gave me a cigarette and I told a man named Jay Edwards that I didn’t know anything. I said what do you want me to do lie and he said go ahead make something up. So everything that was said was told to me by them. Scoff you and I both know that you have never said anything to me about this. Joe is the one who told me and everyone else this. So now there you are stuck and the real person who is still burning stuff up is still running loose.”
(State’s Exhibit 24, C. 230; R. 154-159; 114.)
On cross-examination, Criswell stated that Sheffield never told her that he was involved in the fire. Instead, all of her information about the fire was gathered from other sources. On redirect examination, Criswell testified that Sheffield told her that he did not know that Main Man was in the house. She stated that she never told Sheffield that law-enforcement officials forced her to lie when she telephoned him or visited him in jail in August and September 2007. She indicated that the only time she recanted was in her letter to Sheffield. At trial, however, she indicated that law enforcement officials put pressure on her during the interview in late July 2007.
London testified that Sheffield told her and her husband, Chris Fells, who passed away in 2006, that he had set Chucky Morrow’s house on fire. She also testified that Sheffield told them that he did not know that a child was in the house when he set the fire in the middle of the night. In particular, she recalled that Sheffield said he “snuck out in the middle of the night” and set fire to a cushion underneath Chucky Morrow’s house and then went home and went back to bed. (R. 178.) Sheffield’s defense counsel attempted to impeach London with evidence of several *616 misdemeanor convictions for negotiating worthless instruments in 2004. (R. 180-81.)
Almost four years after the fire, on or around July 25, 2007, Deputy Edwards received a telephone call from Joe Courtney, who claimed that Sheffield had confessed to him that he set the fire that took the lives of Chucky and Main Man Morrow. The case was reopened. Sheffield was arrested and charged with the deaths of the victims.
Joe Courtney, the man whose telephone call resulted in the reopening of the case, testified that in 2007 he and Sheffield were friends and that they were both living in Marengo County at the time. He stated that he had heard rumors that Sheffield had been investigated in connection with the 2003 Chilton County fire, and so he asked Sheffield about the rumors around January 2007. Tiffany Copper, Sheffield’s girlfriend at the time and the mother of his daughter, and Brandye Slocumb, Courtney’s girlfriend, were present when Courtney asked Sheffield about the rumors. According to Courtney, “[h]e told me he went down there and took care of it ... he said he went down there and burnt the house down.” (R. 263). When he placed the call in late July 2007, he and Sheffield were no longer friends because he believed Sheffield had stolen some tools from him.
After the State had rested its case, the defense called one witness. Sheffield’s stepfather, Michael Willis, testified that Joe Courtney stood in his yard in late July 2007 and shouted threats at Sheffield, who was standing on the porch, that if he did not return his tools, he was going to telephone Chilton County law enforcement and implicate Sheffield in the 2003 fire. Thereafter, Sheffield’s defense counsel rested.
I.
Sheffield contends the jury verdicts for the deaths of Chucky Morrow and Main Man Morrow were mutually exclusive, requiring a reversal of his convictions. Specifically, Sheffield argues that the jury’s verdicts were mutually exclusive because the jury found him guilty of reckless murder for the death of one victim and reckless manslaughter for the death of the other victim, where both deaths arose out of one course of conduct. Sheffield was indicted for two counts of reckless murder, which is defined as murder committed “[ujnder circumstances manifesting extreme indifference to human life” by “recklessly engaging] in conduct which creates a grave risk of death to a person other than himself or herself,” and “thereby causfing] the death of another person.” § 13A-6-2(a)(2). Sheffield was ultimately convicted of reckless murder and reckless manslaughter as a result of the fire that killed Chucky Morrow and Main Man Morrow.[3] Although two victims were killed as a result of the fire, only one course of conduct was involved. Thus, we must determine whether the verdicts finding Sheffield guilty of reckless murder and reckless manslaughter for two deaths arising from one course of conduct are mutually exclusive or merely inconsistent. See Hammonds v. State, 7 So.3d 1055 (Ala. 2008); Heard v. State, 999 So.2d 992 (Ala. 2007).
The Alabama Supreme Court discussed inconsistent and mutually exclusive verdicts in Heard, as follows:
*617 “Heard was found guilty of ’more than one offense based on crimes against one victim.
[[Image here]]
“Confusion exists throughout Alabama courts over the difference between inconsistent verdicts and mutually exclusive verdicts. ‘The general rule is that there need be no rational compatibility between the verdicts on the several counts of an indictment. The exception to this rule is where the jury returns multiple convictions as to crimes which are mutually exclusive of each other. Conway v. State, 489 So.2d 641, 642 (Ala.Cr.App.1986).... ’ Grikis v. State, 552 So.2d 187, 187 (Ala.Crim.App.1989). This seemingly straightforward rule has been somewhat difficult to apply because of confusion over the meaning of the terms ‘inconsistent verdicts’ and ‘mutually exclusive verdicts.’
[[Image here]]
“... [MJutually exclusive verdicts are the result of two positive findings of fact that cannot logically coexist. In other words, it is legally impossible for the State to prove the elements of both crimes. In order to determine whether the guilty verdicts are mutually exclusive as a matter of law, the alleged underlying offenses or acts must be carefully scrutinized. The two guilty verdicts are not mutually exclusive if no element of one crime necessarily negates an element of the other.
“Mutually exclusive verdicts exist when a guilty verdict on one count logically excludes a guilty verdict on another count. In contrast, inconsistent verdicts can exist where there is a verdict of guilty and another of not guilty, as when there are two guilty verdicts that are not mutually exclusive. Inconsistent criminal verdicts are permissible; mutually exclusive verdicts are not.
“There has been much confusion as to whether the verdicts returned against Heard were mutually exclusive or merely inconsistent. Heard was convicted of both capital murder and felony murder. According to Alabama law, a defendant must have the intent to kill in order to be found guilty of a capital offense. § 13A-5-40(b), Ala.Code 1975; Ex parte Woodall, 730 So.2d 652, 657 (Ala.1998) (‘No defendant can be found guilty of a capital offense unless he had an intent to kill, and that intent to kill cannot be supplied by the felony-murder doctrine.’). Felony murder, on the other hand, does not require the specific intent to kill; it requires only the intent to commit the underlying felony. § 13A-6-2(a)(3), Ala.Code 1975; Mitchell v. State, 706 So.2d 787 (Ala.Crim.App.1997). The absence of an intent to kill, however, is not necessarily an element of felony murder, as contrasted with the intent to kill, which is an element of capital murder.
“In other words, a felony-murder conviction does not require proof that the defendant unintentionally killed the victim, only that the defendant intended to commit the underlying felony. Therefore, it is possible that a defendant intended to kill the victim (the element necessary for the capital conviction) while at the same time intending to commit an underlying felony (the element necessary for the felony-murder conviction). Therefore, the most that can be said of the verdicts finding Heard guilty both of capital murder and of felony murder is that they may be merely inconsistent. These two verdicts are not mutually exclusive; they do not contain mutually exclusive essential elements.
“Because these verdicts are not mutually exclusive, the verdicts should stand; ‘[t]hat the verdict may have been the *618 result of compromise, or of a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation of inquiry into such matters.’ Dunn [v. United States ], 284 U.S. [390,] 394 [ (1932) ].”
999 So.2d at 997-1005.
Subsequently, in Hammonds, supra, the Alabama Supreme Court spoke to inconsistent and mutually exclusive verdicts where there were three victims, one who was killed and two who were injured, resulting from one course of conduct — the defendant’s driving his automobile while he was under the influence of alcohol.
“ ‘ “Inconsistency” between verdicts is generally understood to mean some logical impossibility or improbability implicit in the jury’s findings on several indictments or informations tried together or as between several counts of a single criminal accusation without severance of the counts.’ State v. Purdie, 144 Idaho 911, 174 P.3d 881, 883 (Ct.App.2007). An inconsistent verdict on different counts of a multiple-count indictment is permissible. A jury verdict on each count is independent; a verdict of either conviction or acquittal of one has no effect or bearing on another. A jury’s verdict may be inconsistent or even illogical but nonetheless permissible if it is supported by sufficient evidence. The rationale for allowing inconsistent verdicts is
“ ‘(1) there is no way to know why the jury rendered an inconsistent verdict, and therefore such verdicts must be upheld in the interest of protecting lenity; (2) since the government cannot appeal inconsistent acquittals, it would be unfair to allow a defendant to appeal inconsistent convictions; and (3) the requirement of a sufficiency of the evidence review on appeal prevents any harm that could result from an inconsistent verdict.’
“State v. Purdie, 174 P.3d at 884 (citing United States v. Powell, 469 U.S. 57, 65-69, 105 S.Ct. 471 (1984) (footnote omitted)). This Court will not disturb guilty verdicts on the basis of apparent inconsistencies so long as there is sufficient evidence to support the verdicts. However, mutually exclusive verdicts are contradictory and cannot be reconciled. Verdicts are mutually exclusive if the existence of any of the elements of one offense negates the existence of any of the elements for another offense of which the defendant also stands convicted.”
7 So.3d at 1061.
This Court, in Burton v. State, 979 So.2d 845 (Ala.Crim.App.2007), applying Heard, supra, in considering whether the verdicts finding the defendant guilty of reckless murder and first-degree arson were mutually exclusive, held that, even if the jury’s verdicts were inconsistent, they were not mutually exclusive. In so holding, this Court reasoned:
“We have carefully examined the appellant’s acts and the offenses for which the jury found him guilty. Based on that review, we find that it was not legally impossible for the State to prove the elements of both offenses because no element of either offense negates an element of the other. Even though reckless murder involves a situation in which the defendant does not intend to kill or injure another person, it does not require that none of his actions be intentional. For example, it does not exclude the possibility that he committed another intentional act, such as setting a fire. Thus, the jury could have reasonably concluded that the appellant acted with extreme indifference to human life but did not intend to kill or injure the victim when he threw gasoline around the den; that the appellant acted intentionally *619 when he started the fire; and that the victim died as a result of both of the appellant’s actions. Therefore, the verdicts were not mutually exclusive.”
979 So.2d at 851. Cf. Martinez v. State, 989 So.2d 1143 (Ala.Crim.App.2007) (holding that verdicts for criminally negligent homicide and second-degree assault, arising from one vehicular accident, were mutually exclusive because a single act cannot be both negligent and reckless).
Reckless murder is defined in Ala.Code 1975,13A-6-2(a)(2), as follows:
“(a) A person commits the crime of murder if he or she does any of the following:
[[Image here]]
“(2) Under circumstances manifesting extreme indifference to human life, he or she recklessly engages in conduct which creates a grave risk of death to a person other than himself or herself, and thereby causes the death of another person.”
With regard to manslaughter, “[a] person commits the crime of manslaughter if he recklessly causes the death of another person.” § 13A-6-3(a)(l), Ala.Code 1975. Section 13A-2-2(3), Ala.Code 1975, defining “recklessly,” provides:
“A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.”
The Alabama Supreme Court, in holding that reckless murder was not an included offense of intentional murder, in Ex parte Washington, 448 So.2d 404 (Ala.1984), said:
“The difference between homicide by reckless conduct manifesting extreme indifference to human life, sometimes referred to as ‘universal malice murder,’ and ‘purposeful’ or ‘knowing murder’ was set forth in Northington v. State, 413 So.2d 1169, 1170 (Ala.Cr.App.1981), which stated:
“ ‘Reckless homicide manifesting extreme indifference to human life (13A-6-2(a)(2)) must be distinguished from purposeful or knowing murder (13A-6-2(a)(l)). See American Law Institute, Model Penal Code and Commentaries, Part II, Section 210.2 (1980). Under whatever name, the doctrine of universal malice, depraved heart murder, or reckless homicide manifesting extreme indifference to human life is intended to embrace those cases where a person has no deliberate intent to kill or injure any particular individual. Napier v. State, 357 So.2d 1001, 1007 (Ala.Cr.App.1977), reversed on other grounds, 357 So.2d 1011 (Ala.1978). “The element of ‘extreme indifference to human life,’ by definition, does not address itself to the life of the victim, but to human life generally.” People By And Through Rttssel v. District Court For Fourth Judicial District, 185 Colo. 78, 521 P.2d 1254, 1256 (1974).’
“See also McCormack v. State, 431 So.2d 1340 (Ala.1983) (where this Court adopted the Court of Criminal Appeals’ interpretation).
“As pointed out, there are several differences between intentional murder, § 13A-6-2(a)(l), and reckless murder, § 13A-6-2(a)(2). One is that the kind of culpability differs in that § 13A-6-2(a)(1) requires intentional conduct and § 13A-6-2(a)(2) requires reckless conduct. Under § 13A-l-9(a)(4), reckless murder could be considered an included *620 offense of intentional murder, the indicted offense, if it differed from the indicted offense only because it required a lesser kind of culpability. However, there is another difference. If only a lesser type of culpability is shown, recklessness, the offense is manslaughter. Code 1975, § 13A-6-3(a)(l). Section 13A-6-2(a)(2) must require something more. Section 13A-6-2(a)(2) requires a showing that the defendant’s conduct was directed at human life in general as opposed to a particular individual. This additional difference between the offense he was indicted for, intentional murder, and universal malice murder precludes the latter from being an included offense, since it can be established only by a showing of facts not required in order to be convicted of intentional murder under § 13A-6-2(a)(1).”
Ex parte Washington, 448 So.2d at 408.
Further, in Ex parte Weems, 463 So.2d 170 (Ala.1984), the Alabama Supreme Court explained the difference between the degree of recklessness that constitutes murder and the degree of recklessness that constitutes manslaughter:
“Alabama’s homicide statutes were derived from the Model Penal Code. In providing that homicide committed ‘recklessly under circumstances manifesting extreme indifference to human life’ constitutes murder, the drafters of the model code were attempting to define a degree of recklessness ‘that cannot be fairly distinguished from homicides committed purposely or knowingly.’ Model Penal Code and Commentaries, § 210.02, Comment, 4 (1980). That standard was designed to encompass the category of murder traditionally referred to as ‘depraved heart’ or ‘universal malice’ killings. Examples of such acts include shooting into an occupied house or into a moving automobile or piloting a speedboat through a group of swimmers. See LaFave & Scott, Criminal Law, § 70 (1972).
“Recklessly causing another’s death may give rise to the lesser included offense of manslaughter. A defendant who recklessly causes another’s death commits manslaughter if he ‘consciously disregarded] a substantial and unjustifiable risk that his conduct would cause that result.’ Model Penal Code and Commentaries, § 210.03, Comment 4 (1980). The difference between the circumstances which will support a murder conviction and the degree of risk contemplated by the manslaughter statute is one of degree, not kind. From a comparison of Sections 210.03 and 210.02 of the Model Code, it appears that the degree of recklessness which will support a manslaughter conviction involves a circumstance which is a ‘gross deviation from the standard of conduct that a law-abiding person would observe in the actor’s situation,’ but is not so high that it cannot be ‘fairly distinguished from’ the mental state required in intentional homicides. Compare Comment 4 to § 210.02 with Comment 4 to § 210.03.”
463 So.2d at 172 (footnote omitted).
With regard to reckless murder, this Court stated, in King v. State, 505 So.2d 403, 407 (Ala.Crim.App.1987):
“Section 13A-6-2(a)(2) requires the prosecution to prove conduct which manifests an extreme indifference to human life, and not to a particular person only. Its gravamen is the act of recklessfness] by engaging in conduct which creates a grave or very great risk of death under circumstances ‘manifesting extreme indifference to human life.’ What amounts to ‘extreme indifference’ depends on the circumstances of each case, *621 but some shocking, outrageous, or special heinousness must be shown. Commentary to § 13A-6-2(a)(2); Northington [v. State, 413 So.2d 1169 (Ala.Crim.App.1981)]. A person acts recklessly when he is aware of and consciously disregards a substantial and unjustifiable risk. § 13A-2-2(3). ‘The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.’ Id. To bring appellant’s conduct within the murder statute, the State is required to establish that his act was imminently dangerous and presented a very high or grave risk of death to others and that it was committed under circumstances which evidenced or manifested extreme indifference to human life. The conduct must manifest extreme indifference to human life generally. Ex parte McCormack, [431 So.2d 1340 (Ala.1983) ]; Northington, supra. The crime charged here differs from intentional murder in that it results not from a specific, conscious intent to cause the death of any particular person, but from an indifference to or disregard of the risks attending appellant’s conduct.”
505 So.2d at 407.
The mental states required for reckless murder and reckless manslaughter are not mutually exclusive. For both offenses, it must be proved that the defendant recklessly caused another’s death. The greater offense, reckless murder, adds that under circumstances manifesting extreme indifference the defendant engages in conduct that creates a grave risk of death to a person other than himself or herself. No element of either offense negates an element of the other. The reckless-murder charge required proof that Sheffield had recklessly caused the death of a person under circumstances manifesting extreme indifference to the value of human life. The reckless-manslaughter charge required proof that Sheffield recklessly caused the death of another person. As to the reckless-manslaughter conviction, it may be said that the jury found that the child’s death did not result from circumstances manifesting extreme indifference to the value of human life or that the jury simply chose not to convict on that charge for reasons not readily apparent in the record.
“‘Consistency in the verdict is not necessary. Each count in the indictment is regarded as if it was a separate indictment.... That the verdict may have been the result of compromise, or of a mistake on the part of the jury, is possible. But verdicts cannot by upset by speculation or inquiry into such matters.’
“Dunn v. United States, 284 U.S. 390, 393-94, 52 S.Ct. 189, 76 L.Ed. 356 (1932).”
Hammonds, 7 So.3d at 1063. Thus, because the verdicts were not mutually exclusive, Sheffield is not entitled to any relief on this claim.[4] We must, however, next address whether the verdicts are supported by sufficient evidence.
II.
Sheffield also contends the trial court erred in failing to grant his posttrial motions for a new trial and for a judgment of acquittal because, he says, the evidence was insufficient to sustain his convictions for reckless murder and reckless man *622 slaughter.[5] He challenges the sufficiency of the evidence on the reckless-murder conviction because, he says, the evidence was insufficient to show universal malice or disregard for human life generally. He also challenges the sufficiency of the evidence on both convictions because, he alleges, the State failed to establish the corpus delicti of the offenses independently of the extrajudicial confessions or inculpatory statements made by him. Sheffield preserved this issue for review by moving for a judgment of acquittal at the close of the State’s case and the close of all evidence and by filing postjudgment motions for a new trial and for a judgment of acquittal.
As to the sufficiency of the evidence,
“in deciding whether there is sufficient evidence to support the verdict of the jury and the judgment of the trial court, the evidence must be reviewed in the light most favorable to the prosecution. Cumbo v. State, 368 So.2d 871 (Ala.Cr.App.1978), cert. denied, 368 So.2d 877 (Ala.1979). Conflicting evidence presents a jury question not subject to review on appeal, provided the state’s evidence establishes a prima facie case. Gunn v. State, 387 So.2d 280 (Ala.Cr.App.), cert. denied, 387 So.2d 283 (Ala.1980). The trial court’s denial of a motion for a judgment of acquittal must be reviewed by determining whether there existed legal evidence before the jury, at the time the motion was made, from which the jury by fair inference could have found the appellant guilty. Thomas v. State, 363 So.2d 1020 (Ala.Cr.App.1978). In applying this standard, the appellate court will determine only if legal evidence was presented from which the jury could have found the defendant guilty beyond a reasonable doubt. Willis v. State, 447 So.2d 199 (Ala.Cr.App.1983); Thomas v. State. When the evidence raises questions of fact for the jury and such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion for a judgment of acquittal by the trial court does not constitute error. Young v. State, 283 Ala. 676, 220 So.2d 843 (1969); Willis v. State.”
Breckenridge v. State, 628 So.2d 1012,1018 (Ala. Crim. App.1993).
“ ‘In determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider the evidence in the light most favorable to the prosecution.’ Faircloth v. State, 471 So.2d 485, 489 (Ala.Cr.App.1984), affirmed, Ex parte Faircloth, [471] So.2d 493 (Ala.1985).
[[Image here]]
“ ‘ “The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision to the jury.” Ex parte Bankston, 358 So.2d 1040, 1042 (Ala.1978). An appellate court may interfere with the jury’s verdict only where it reaches “a clear conclusion that the finding and judgment are wrong.” Kelly v. State, 273 Ala. 240, 244, 139 So.2d 326 (1962).... A verdict on conflicting evidence is conclusive on appeal. Roberson v. State, 162 Ala. 30, 50 So. 345 (1909). “[W]here there is ample evidence offered by the state to support a verdict, it should not be overturned even though the evidence offered by the defendant is in sharp conflict therewith and presents a substantial defense.” Fuller v. State, 269 Ala. 312, *623 333, 113 So.2d 153 (1959), cert. denied, Fuller v. Alabama, 361 U.S. 936, 80 S.Ct. 380, 4 L.Ed.2d 358 (1960).’ Granger [v. State], 473 So.2d [1137,] 1139 [ (Ala.Crim.App.1985) ].”
White v. State, 546 So.2d 1014, 1017 (Ala.Crim.App.1989). Also,
“ ‘[e]ircumstantial evidence is not inferior evidence, and it will be given the same weight as direct evidence, if it, along with the other evidence, is susceptible of a reasonable inference pointing unequivocally to the defendant’s guilt. Ward v. State, 557 So.2d 848 (Ala.Cr.App.1990). In reviewing a conviction based in whole or in part on circumstantial evidence, the test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude. Cumbo v. State, 368 So.2d 871 (Ala.Cr.App.1978), cert. denied, 368 So.2d 877 (Ala.1979).’
“Ward [v. State], 610 So.2d [1190] at 1191-92 [ (Ala.Crim.App.1992) ].”
Lockhart v. State, 715 So.2d 895, 899 (Ala.Crim.App.1997).
“ ‘ “ ‘Whether circumstantial evidence tending to connect the defendant with the crime excludes, to a moral certainty, every other reasonable hypothesis than that of the defendant’s guilt is a question for the jury and not the court.’ [Cumbo v. State, 368 So.2d 871 (Ala.Crim.App.1978) ]; Cannon v. State, 17 Ala.App. 82, 81 So. 860 (1919). Our function is not to be factfinders, however tempting that may sometimes be. We must not substitute ourselves for jurors, nor play their role in the criminal process. Jury verdicts should not be disturbed unless they are not based upon evidence sufficient to meet the test set out above.” ’ ”
Gissendanner v. State, 949 So.2d 956, 973 (Ala.Crim.App.2006), quoting Parker v. State, 589 So.2d 773, 776 (Ala.Crim.App. 1991), quoting in turn Linzy v. State, 455 So.2d 260, 262 (Ala.Crim.App.1984).
Additionally, it is well settled that “[t]he weight and probative value to be given to the evidence, the credibility of the witnesses, the resolution of conflicting testimony, and inferences to be drawn from the evidence are for the jury.” Smith v. State, 698 So.2d 189, 214 (Ala.Crim.App.1996), aff'd, 698 So.2d 219 (Ala.1997).
“In Johnson v. State, 555 So.2d 818, 819-20 (Ala.Cr.App.1989), this court noted the difference in ‘sufficiency’ and ‘weight’ as follows:
“‘The weight of the evidence is clearly a different matter from the sufficiency of the evidence. The sufficiency of the evidence concerns the question of whether, “viewing the evidence in the light most favorable to the prosecution, [a] rational factfinder could have found the defendant guilty beyond a reasonable doubt.” Tibbs v. Florida, 457 U.S. 31, 37, 102 S.Ct. 2211, 2215, 72 L.Ed.2d 652 (1982). Accord Prantl v. State, 462 So.2d 781, 784 (Ala.Cr.App.1984).
[[Image here]]
“ ‘In contrast, “[t]he ‘weight of the evidence’ refers to ‘a determination [by] the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other.’ ” Tibbs v. Florida, 457 U.S. at 37-38 [102 S.Ct. at 2216] (emphasis added). We have repeatedly held that it is not the province of this court to reweigh the evidence presented at trial. E.g., Franklin v. State, 405 So.2d 963, 964 (Ala.Cr.App.), cert. denied, 405 So.2d 966 (Ala.1981); Crumpton *624 v. State, 402 So.2d 1081, 1085 (Ala.Cr.App.), cert. denied, 402 So.2d 1088 (Ala.1981); Nobis v. State, 401 So.2d 191, 198 (Ala.Cr.App.), cert. denied, 401 So.2d 204 (Ala.1981). “‘[T]he credibility of witnesses and the weight or probative force of testimony is for the jury to judge and determine.’ ” Harris v. State, 518 So.2d 79, 81 (Ala.Cr.App.1987) (quoting Byrd v. State, 24 Ala.App. 451, 136 So. 431 (1931)).[’]
“(Emphasis in original.) See Smith v. State, 604 So.2d 434 (Ala.Cr.App.1992); Pearson v. State, 601 So.2d 1119 (Ala.Cr.App.1992); Curry v. State, 601 So.2d 157 (Ala.Cr.App.1992).”
Zumbado v. State, 615 So.2d 1223, 1240 — 41 (Ala.Crim.App.1993).
Because Sheffield submits two arguments concerning the sufficiency of the State’s evidence, we address each in turn.
A.
Sheffield claims that the reckless-murder conviction for the death of Chucky Morrow should be reversed because, he says, the evidence was insufficient to establish universal malice. As previously set out, a person commits the crime of reckless murder if “[u]nder circumstances manifesting extreme indifference to human life, he or she recklessly engages in conduct which creates a grave risk of death to a person other than himself or herself, and thereby causes the death of another person.” § 13A-6-2(a)(2), Ala. Code 1975.
“ ‘[This section] requires the prosecution to prove conduct that manifests an extreme indifference to human life and not to the life of any particular person. The purpose of § 13A-6-2(a)(2) is to embrace those homicides caused by such acts as shooting a firearm into a crowd, throwing a timber from a roof onto a crowded street, or driving an automobile in a grossly wanton manner. See Northington v. State, 413 So.2d 1169 (Ala.Cr.App.1981), writ quashed, 413 So.2d 1172 (Ala.1982). This section was written in an attempt to define a degree of recklessness “that cannot be fairly distinguished from homicides committed purposely or knowingly.” Model Penal Code and Commentaries, § 210.02, comment 4 (1980), as quoted in Ex parte Weems, 463 So.2d 170, 172 (Ala.1984). Under the concept of reckless murder, the actor perceives a substantial and unjustified risk but consciously disregards the risk of death.’
“Simmons v. State, 649 So.2d 1282, 1284 (Ala.1994)”
D.D.A. v. State, 650 So.2d 571, 578 (Ala.Crim.App.1994). See also Ex parte Simmons, 649 So.2d 1282, 1284 (Ala.1994) (“[Reckless murder] requires the prosecution to prove conduct that manifests an extreme indifference to human life and not to the life of any particular person.”); Ex parte McCormack, 431 So.2d 1340 (Ala.1983) (reckless murder is not appropriate where the acts resulting in death are directed toward one or more particular people, rather than toward human life in general); Dunaway v. State, 746 So.2d 1021, 1034-35 (Ala.Crim.App.1998), aff'd, 746 So.2d 1042 (Ala.1999) (“A charge on reckless murder is not appropriate where the acts resulting in death are directed toward one or more particular people ... rather than toward human life in general.”); Haney v. State, 603 So.2d 368, 399 (Ala.Crim.App.1991), aff'd, 603 So.2d 412 (Ala.1992) (“The doctrine of universal malice, depraved heart murder, or reckless homicide manifesting extreme indifference to human life is intended to embrace those cases where a person has no deliberate intent to kill or injure any particular individual.”); *625 McLaughlin v. State, 586 So.2d 267, 270 (AIa.Crim.App.1991) (providing that the element of “extreme indifference to human life” by definition does not apply to the life of the victim, but to human life in general); Gholston v. State, 494 So.2d 876, 883 (Ala.Crim.App.1986) (to be reckless, a crime must be directed toward the general public, not toward a particular person); Baker v. State, 472 So.2d 700, 703 (Ala.Crim.App.1985) (reckless murder “is intended to embrace those cases where a person has no deliberate intent to kill or injure any particular individual”); Northington v. State, 413 So.2d 1169, 1171 (Ala.Crim.App.1981) (where the defendant’s acts were specifically directed at a particular victim and no one else, she could not be convicted of reckless murder under § 13A-6-2(a)(2), Code of Alabama 1975). The circumstances of each case determine what amounts to extreme indifference. King, 505 So.2d at 407; Northington, 413 So.2d at 1171.
“Typical illustrations of the doctrine of universal malice are wilfully riding an unruly horse into a crowd, and throwing a timber from a roof into a crowded street. Moore v. State, 18 Ala. 532 (1851). Other examples are shooting a firearm into a crowd or into a train, dwelling house or automobile containing occupants. Bailey v. State, 133 Ala. 155, 32 So. 57 (1901); Johnson v. State, 203 Ala. 30, 81 So. 820 (1919); Washington v. State, 60 Ala. 10, 31 Am.Rep. 28 (1877); see also Gallant v. State, 167 Ala. 60, 52 So. 739 (1910) (setting off explosion beneath a house); Presley v. State, 59 Ala. 98 (1877) (placing obstacles on railroad track); Langford v. State, Ala.Cr.App.1977, 354 So.2d 297 (driving an automobile in a grossly wanton manner).”
Napier v. State, 357 So.2d 1001, 1007 (Ala.Crim.App.1977), rev’d on other grounds, 357 So.2d 1011 (Ala.1978). See also Northington, supra.
The evidence showed that Sheffield’s conduct was directed toward or aimed at Chucky Morrow and not to human life in general. See, e.g., Williams v. State, 736 So.2d 1134, 1141 (Ala.Crim.App.1998) (holding that the evidence was insufficient to support convictions for reckless murder where the defendants engaged in gunfight in a residential area with dozens of people present because the defendants were clearly attempting to shoot each other); Dunaway, supra (reckless murder is not appropriate where the acts resulting in death are directed toward one or more particular people). The doctrine of universal malice, depraved heart murder, or reckless homicide manifesting extreme indifference to human life is intended to embrace those cases where a person has no deliberate intent to kill or injure any particular individual. Ex parte Simmons, supra; Ex parte McCormack, supra. When considered with the evidence in its entirety, the State’s arguments that Sheffield “did not have a specific intent to harm or injure any person,” but instead “intended to scare or send a message” and that a jury could have found that he acted recklessly with a depraved indifference to human life because he lacked knowledge of who, if anyone, was inside the residence when the fire was started” are not persuasive. The evidence, albeit circumstantial, demonstrated that Sheffield burned Chucky Morrow’s house, which resulted in Chucky’s death. Sheffield’s act of arson was directed toward Chucky Morrow and the house where he knew Chucky lived, not toward humankind in general. Typically, an example of reckless murder includes “arson of a public building,” not arson of a private home. Ex parte Simmons, 649 So.2d at 1286. Thus, we conclude that there was insufficient evidence indicating that the act Sheffield committed *626 manifested extreme indifference to human life in general. Accordingly, Sheffield’s conviction for reckless murder must be reversed.[6] We hold, however, there was sufficient evidence to support a conviction for the lesser-included offense of reckless manslaughter as to Chucky Morrow. See Brooks v. State, 629 So.2d 717, 718 (Ala.Crim.App.1993) (reckless manslaughter includes those killings in which the act resulting in the victim’s death was directed to one or more particular persons). See also Williams, supra. However, we must first consider Sheffield’s remaining sufficiency-of-the-evidence argument as to both victims, Chucky Morrow and Main Man Morrow.
B.
Sheffield also claims that the evidence was insufficient to support the convictions, independent of the extrajudicial confessions or inculpatory statements made by Sheffield to Joe Courtney and others. Because of our disposition of the reckless-murder conviction, our discussion regarding Sheffield’s remaining sufficiency-of-the-evidence claim is limited to the reckless-manslaughter convictions.
“It has been the rule in Alabama that the State must offer independent proof of the corpus delicti of the charged offense to authorize the admission of a defendant’s confession or inculpatory statement. Robinson v. State, 560 So.2d 1130, 1135-36 (Ala.Cr.App.1989); see C. Gamble, McElroy’s Alabama Evidence, 200.13 (5th ed. 1996). ‘ “The corpus de-licti consists of two elements: ‘(1) That a certain result has been produced ... and (2) that some person is criminally responsible for the act.’” Johnson [v. State, 473 So.2d 607, 608 (Ala.Cr.App. 1985),] (quoting C. Gamble, McElroy’s Alabama Evidence § 304.01 (3d ed. 1977)).’ Spear v. State, 508 So.2d 306, 308 (Ala.Cr.App.1987). ‘ “Positive, direct evidence of the corpus delicti is not indispensable to the admissions of confessions” ’ Bracewell v. State, 506 So.2d 354, 360 (Ala.Cr.App.1986), quoting Ryan v. State, 100 Ala. 94, 14 So. 868 (1894). ‘The corpus delicti may be established by circumstantial evidence.’ Sockwell v. State, 675 So.2d 4, 21 (Ala.Cr.App.1993), aff'd, 675 So.2d 38 (Ala. 1995), cert, denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996).”
Maxwell v. State, 828 So.2d 347, 357 (Ala.Crim.App.2000).
“ ‘ “Independent evidence of the corpus delicti need not be of such probative strength as that such evidence, standing alone, in the opinion of the trial or appellate court, would, ought to or probably would satisfy a jury beyond a reasonable doubt of the existence of the corpus delicti. Independent evidence of the corpus delicti may consist solely of circumstantial evidence. Whether the independent evidence tending to prove the corpus delicti is sufficient to warrant a reasonable inference of the existence thereof depends, of course, upon the particular facts of each case.” ’
“Bush v. State, 695 So.2d 70, 117 (Ala.Cr.App.1995), aff'd, 695 So.2d 138 (Ala.1997), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997), quoting C. Gamble, McElroy’s Alabama Evidence § 304.01 (4th ed. 1991) (footnotes omitted in Bush)-, see also Howell v. State, 571 So.2d 396 (Ala.Cr.App.1990). ‘The presentation of facts, from which the jury may reasonably infer that the *627 crime charged was committed, requires the submission of the question to the jury.’ Watters v. State, 369 So.2d 1262, 1272 (Ala.Cr.App.1978), rev’d on other grounds, 369 So.2d 1272 (Ala.1979).
“Further, it is well settled that
“ ‘ “inconclusive facts and circumstances tending prima facie to show the corpus delicti may be aided by the admissions or confession of the accused so as to satisfy the jury beyond a reasonable doubt, and so to support a conviction, although such facts and circumstances, standing alone, would not thus satisfy the jury of the existence of the corpus delicti.” ’
“Bush, 695 So.2d at 117-18, quoting Bridges v. State, 284 Ala. 412, 417, 225 So.2d 821, 826 (1969); see also Bracewell, 506 So.2d at 360; Spear, 508 So.2d at 308. ‘While a confession is inadmissible as prima facie proof of the corpus delicti, it can be used along with other evidence to satisfy the jury of the existence of the corpus delicti.’ Bracewell, supra at 360; see also Howell, 571 So.2d at 397. As Professor Gamble has observed:
“ ‘The purpose of requiring proof of the corpus delicti, as a condition precedent to the admission of a confession, is to insure its trustworthiness. For this reason, there is some judicial language to the effect that corroborative evidence independent of the confession need not be sufficient to establish corpus delicti but must be sufficient independent evidence which would tend to establish the trustworthiness of the confession.’
“McElroy’s Alabama Evidence, § 200.13 at 100 (5th ed. 1996). Finally, we have held:
“ ‘ “Evidence of facts and circumstance, attending the particular offense, and usually attending the commission of similar offenses — or of facts to the discovery of which the confession has led, and which would not probably have existed if the offense had not been committed — would be admissible to corroborate the confession. The weight which would be accorded them, when connected with the confession, the jury must determine, under proper instructions from the court.” ’
“Bush, supra at 118, quoting Matthews v. State, 55 Ala. 187, 194 (1876); see also Bracewell, supra.”
828 So.2d at 357-58. “The term corpus delicti means the body or the substance of the crime and connotes the commission of the offense by the criminal agency of someone.” Tanner v. State, 57 Ala.App. 254, 264, 327 So.2d 749, 759 (1976). “Proof of the corpus delicti does not necessarily include evidence connecting [the] defendant with the crime.” Arnold v. State, 57 Ala.App. 172, 173, 326 So.2d 700, 701 (1976). See also C. Gamble, McElroy’s Alabama Evidence, § 304.01 (6th ed. 2009) (“the term corpus delicti does not mean or include the guilty agency of the accused in the commission of the charged crime”). Independent evidence of the corpus delicti may be solely circumstantial, and the jury is free to draw reasonable inferences from that evidence. Howell v. State, 571 So.2d 396, 397 (Ala.Crim.App.1990). Furthermore, even if the corpus delicti is not proven before the admission or evidence of the confession, then such proof after its admission will cure the error. See Marcus v. State, 568 So.2d 342 (Ala.Crim.App. 1990). See also Woods v. State, 641 So.2d 316, 321 (Ala.Crim.App.1993).
In the case of a homicide, where the charge is murder, manslaughter, or criminally negligent homicide, the corpus delicti includes two requirements: *628 (1) the death of the victim named in the indictment, and (2) that the death was caused by the criminal agency of another. Ex parte Bailey, 590 So.2d 354, 356 (Ala.1991). See Thomas v. State, 393 So.2d 504, 507 (Ala.Crim.App.1981). The corpus delicti of arson consists of proof (1) that a building was burned, and (2) that the building was wilfully burned by some responsible person.[7] Ex parte Locke, 527 So.2d 1347, 1348 (Ala.1988). “[B]urning by accidental and natural causes must be satisfactorily excluded.” Id. Additionally, “[t]he corpus delicti of the offense of arson may be established by inference, see Bolden v. State, 568 So.2d 841 (Ala.Crim.App. 1989), and by circumstantial evidence. Bolden; Smiley v. State, 376 So.2d 813 (Ala.Crim.App.1979).” McCostlin v. State, 594 So.2d 214, 218 (Ala.Crim.App.1991). See also Ex parte Locke, supra; C.L.M. v. State, 531 So.2d 699, 703 (Ala.Crim.App. 1988); Smiley v. State, 376 So.2d 813, 815 (Ala.Crim.App.1979).
“A person commits the crime of manslaughter if ... he recklessly causes the death of another person.” § 13A-6-3(a)(1), Ala Code.1975. Section 13A-2-2(3), defining “recklessly,” provides:
“A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.”
By the time Joe Courtney’s testimony was presented to the jury, it was established that Chucky Morrow and Main Man Morrow had died as a result of the fire. The facts of the case and reasonable inferences from those facts support and corroborate Sheffield’s inculpatory statements to Joe Courtney and others in which he stated that he set the fire that caused the deaths of Chucky Morrow and Main Man Morrow. The evidence showed that Sheffield believed that Chucky Morrow had stolen pit-bull puppies from him. The evidence also indicated that Sheffield filled a prescription for Xanax immediately before the fire and told several individuals that he was planning on giving Chucky Morrow Xanax pills as “truth serum” to get him to confess to stealing the puppies. Law-enforcement officers had testified about the incident report for the stolen puppies filed by Sheffield several days before the fire and Sheffield’s threat to burn Chucky Morrow’s house when he filed the report. Other witnesses had testified about Sheffield’s whereabouts on the evening before the fire. Cooper, who was living with Sheffield at the time of the fire, testified that Sheffield was wearing different clothing on the morning of the fire than he was wearing when he went to bed. The State also presented evidence that Sheffield told Cooper, as they discussed spirituality, that he would not be going to heaven because he had killed somebody. Sheffield expressed this same sentiment to Brandye Slocumb. Additionally, when Cooper indicated to Sheffield that she was saddened because a child, Main Man Morrow, was killed in the fire, he replied that it did not matter because he would turn out to be just like his father, Chucky Morrow. Sheffield also told Erica Criswell that he did not know that a child, Main Man Morrow, was in the house on the day of the fire. As noted above, “ ‘[t]he presentation of facts, from which the jury may reasonably infer that the crime charged was committed, requires the submission of *629 the question to the jury.’ ” Maxwell, 828 So.2d at 357, quoting Watters v. State, 369 So.2d 1262, 1272 (Ala.Crim.App.1978), rev’d on other grounds, 369 So.2d 1272 (Ala.1979). Further, the fact that evidence of Sheffield’s admissions was presented at trial before the presentation of some of the other circumstantial evidence did not result in reversible error. See Woods, supra; Marcus, supra. See, e.g., Pawloski v. State, 269 Ind. 350, 360, 380 N.E.2d 1230, 1235 (1978) (no error for the trial court to allow the State to reopen its casein-chief in order to establish the corpus delicti of arson). Based on the facts of this case, we conclude that, although the facts and circumstances surrounding the offenses may be inconclusive without the extrajudicial confessions or inculpatory statements Sheffield made to Joe Courtney and several other individuals, the State presented sufficient evidence to raise a “‘reasonable inference of the existence of the corpus delicti’” of reckless manslaughter. Bush v. State, 695 So.2d 70, 117 (Ala.Crim.App.1995), affd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997), quoting C. Gamble, McElroy’s Alabama Evidence § 304.01 (4th ed. 1991). Therefore, contrary to Sheffield’s claim, the corpus delicti was established independent of his confessions or statements.
In addition, the evidence of the corpus delicti, coupled with Sheffield’s admissions, established a prima facie ease of reckless manslaughter as to both victims, Chucky Morrow and Main Man Morrow. Reviewing the evidence, as we must, in the light most favorable to the State, we conclude that the State presented sufficient evidence to submit the case to the jury. Absent clear and convincing evidence to the contrary, this court will not reverse a jury’s determination. Hoobler v. State, 668 So.2d 905 (Ala.Crim.App.1995). This case does not present such a situation. Thus, the trial court did not err in denying Sheffield’s motions for a new trial or a judgment of acquittal on sufficiency-of-the-evidence grounds.
III.
Sheffield next argues the trial court erred in overruling his objection to the prosecutor’s displaying on a screen during closing argument a transcript of a portion of an inaudible tape-recorded telephone conversation. The State responds that the prosecutor’s action presented his impression of the evidence, which was permissible. The State also counters that Sheffield was not prejudiced because the jury could listen to the tape-recording, which was admitted into evidence and played during the trial, during deliberations.
At trial, the State admitted into evidence and played a tape-recording of a jailhouse telephone conversation between Sheffield and another man, which occurred on August 1, 2007.[8] After the tape was played, the following exchange occurred:
“[STATE]: May I poll the jury as to whether they all made that out, Your Honor?
“JUROR: I didn’t hear any of it.
“JUROR: I couldn’t understand a word.
“THE COURT: I concur with them. It’s unanimous. I don’t think any of us could understand it.”
(R. 238.) The State then asked the witness on the stand, Deputy Edwards, to tell the jury what he thought Sheffield said on the tape. Sheffield’s counsel objected:
“[DEFENSE COUNSEL]: Your Honor, I would object to what it says.
*630 He’s played the tape, it is what it is. It would be for the jury to determine what it says or doesn’t say.
“THE COURT: I agree. I don’t know if there is a legal ruling of ‘it is what it is,’ but I’m not going to allow the witness to speculate as to what it says. The jury and I have heard it and it is what it is.”
(R. 238.) The closing arguments of counsel are not included in the record. The following objection, which was transcribed, occurred during the State’s closing argument:
“[DEFENSE COUNSEL]: I want to enter an objection to him putting on the screen his version of what the tape of the telephone conversation says. As we discussed when it was first played, the recording is what it is and it is for the jurors to make out what it says. And for him to suggest to them what it says would be in effect testifying as to what it says and I would object to that.
“THE COURT: Overruled. The attorneys are entitled to argue what they believe the evidence to be. The jury understands that what they say is not evidence.”
(R. 336.) However, according to the transcript of the hearing on the motion for a new trial, which is included in the record on appeal, the State’s version of what Sheffield said during the tape-recorded telephone call was: “I tell you what, get him drunk, get some Xanax. Get my momma to give you a check, get some Xanax.” (R. 419)
It is well settled that
“ ‘during closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.’ Rutledge v. State, 523 So.2d 1087, 1100 (Ala. Cr.App.1987), rev’d on other grounds, 523 So.2d 1118 (Ala.1988) (citation omitted). Wide discretion is allowed the trial court in regulating the arguments of counsel. Racine v. State, 290 Ala. 225, 275 So.2d 655 (1973). ‘In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, ... each case must be judged on its own merits,’ Hooks v. State, 534 So.2d 329, 354 (Ala.Cr.App.1987), aff'd, 534 So.2d 371 (Ala. 1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989) (citations omitted) (quoting Barnett v. State, 52 Ala.App. 260, 264, 291 So.2d 353, 357 (1974)), and the remarks must be evaluated in the context of the whole trial, Duren v. State, 590 So.2d 360 (Ala.Cr.App.1990), aff'd, 590 So.2d 369 (Ala.1991). ‘In order to constitute reversible error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury.’ Mitchell v. State, 480 So.2d 1254, 1257-58 (Ala.Cr.App.1985) (citations omitted). ‘To justify reversal because of an attorney’s argument to the jury, this court must conclude that substantial prejudice has resulted.’ Twilley v. State, 472 So.2d 1130, 1139 (Ala.Cr.App.1985) (citations omitted).”
Coral v. State, 628 So.2d 954, 985 (Ala.Crim.App.1992).
Because we are unable to discern the context in which the allegedly improper action by the prosecutor occurred, we cannot find any abuse of discretion by the trial court in overruling Sheffield’s objection. E.g., Jennings v. State, 513 So.2d 91, 98 (Ala.Crim.App.1987); State Farm Mut. Auto. Ins. Co. v. Boyer, 357 So.2d 958, 964 (Ala.1978) (when the entire closing argument was not included in record, context of what was said was insufficient to justify conclusion of improper argument). “The trial judge can best determine when discussion by counsel is legitimate and when *631 it degenerates into abuse.” Henderson v. State, 460 So.2d 331, 333 (Ala.Crim.App. 1984). When the objection was made, the trial court reminded the jury that argument of counsel did not constitute evidence, and instructed the jury accordingly before the arguments of counsel and again during its oral charge, and the jury is presumed to follow the trial court’s instructions. See Taylor v. State, 666 So.2d 36 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995). See also Burgess v. State, 827 So.2d 134, 162 (Ala.Crim.App.1998) (“Jurors are presumed to follow the court’s instructions.”). Further, it is well established that a prosecutor is allowed during closing argument to draw reasonable inferences from the evidence presented. See Ballard v. State, 767 So.2d 1123, 1135 (Ala. Crim.App.1999). Additionally, questions concerning the “inaudible” portions of the recording went to the weight that the jury should afford the statements. See, e.g., Clark v. State, 562 So.2d 620, 624 (Ala.Crim.App.1989). Consequently, based on the record before us, we find no error.
IV.
Sheffield also argues that his trial counsel was ineffective on various grounds. All the ineffective-assistance-of-counsel claims were presented in Sheffield’s motions for a new trial and for a judgment of acquittal. The State filed responses to Sheffield’s motions, and the trial court conducted an evidentiary hearing. Following the hearing, the trial judge entered a detailed order denying Sheffield’s motions. In regard to the ineffective-assistance-of-counsel claims now raised on appeal, the order denying the motion for a new trial provided, in pertinent part:
“[Sheffield] was represented during the pre-trial proceedings and trial of this case by Robert Bowers, Jr. of Clanton, Alabama. Mr. Bowers serves as contract counsel in the Nineteenth Judicial Circuit and represents indigent defendants. Mr. Bowers represents indigent defendants in all three counties of this circuit and has handled and tried hundreds if not thousands of cases over the years. In fact, Mr. Bowers has practiced and tried cases before the undersigned judge over the last 23 years. Mr. Bowers is extremely knowledgeable and efficient in his representation of people who are charged with criminal offenses. He uses his wealth of experience in defending these cases before juries and the Court. Mr. Bowers presents and defends his cases before juries in such a manner that his defenses can be readily understood.
“The prosecution in Mr. Sheffield’s case relied upon circumstantial evidence in securing his convictions for reckless murder and manslaughter. Of all the cases that this Court has tried, this case was one of the most ‘circumstantial.’ As such, Mr. Bowers relied primarily upon a defense that the State would be unable to prove Mr. Sheffield’s guilt beyond a reasonable doubt. With that in mind, strategic decisions were made on how to defend the case and how to question witnesses.
“Special care was taken by both Mr. Bowers and the District Attorney regarding a recorded statement that Mr. Sheffield made while he was in the Chil-ton County Jail. Portions of that statement which mentioned and discussed another fire in Marengo County were redacted and special care was taken during the trial of this case to make sure that the jury heard nothing about the possibility or probability that Mr. Sheffield had been involved in the burning of the home of one of the State’s witnesses.
“(1) [Sheffield] alleges that Mr. Bowers is ineffective in failing to specify, *632 in making his motion for judgment of acquittal, that the State failed to prove sufficient evidence of ‘universal malice’ or that [Sheffield’s] ‘conduct displayed an indifference to human life generally’ and in failing to object to the jury being charged on reckless murder. The Court finds that this allegation is without merit in that Mr. Bowers’ Motion for Judgment of Acquittal made at the conclusion of the State’s case and at the conclusion of all evidence in the case was legally sufficient. The Court finds that the jury in this case was instructed properly and therefore Mr. Bowers’ failure to object to those instructions is certainly not ineffective.
“(2) [Sheffield] claims that Mr. Bowers was ineffective in failing to object to the State’s evidence produced at trial, which showed conduct directed at a particular person or persons rather than human life generally, as being a variance with the charged offense of reckless murder and constituting a constructive amendment to the indictment. The Court finds that this allegation is without merit and that defense counsel properly objected to the State’s evidence when appropriate during the trial of this case.
“(3) [Sheffield] claims that Mr. Bowers was ineffective in failing to object that the State’s argument and evidence at trial, to the extent it suggested to the jury that Sheffield intended to kill one or both victims, was at variance with the charged offense of reckless murder and constituted a constructive amendment to the indictment. The Court finds that this allegation is without merit and that defense counsel made the appropriate objections during the trial of this case. “(4) [Sheffield] claims that Mr. Bowers was ineffective for failing to object to the admission into evidence of any extrajudicial admissions or confessions allegedly made by Sheffield before the State established the corpus delicti of the offenses charged. The Court finds that this allegation is without merit.
[[Image here]]
“(6) [Sheffield] argues that Mr. Bowers was ineffective for failing to ask for several jury charges which were necessary for the jury to appropriately decide the issues present in this case. The Court finds that this argument is without merit. The Court discussed jury charges in a charge conference with both defense counsel and the District Attorney and the Court charged on issues requested by defense counsel. Specifically, the Court gave charges on lesser-included offenses of manslaughter and criminally negligent homicide. This defendant was found guilty on a lesser-included offense of manslaughter under count II of the indictment regarding the death of [Main Man]....
[[Image here]]
“(7) [Sheffield] alleges that Mr. Bowers was ineffective in failing to impeach the credibility of the State’s witnesses Joseph Courtney and Lisa [London] with their prior felony convictions. Mr. Bowers testified that he was unaware of prior felony convictions of Mr. Courtney and Ms. [London], There is no evidence that Mr. Sheffield was aware of those prior convictions and there is certainly no evidence that Mr. Sheffield, their close personal friend, ever told Mr. Bowers that he should seek to determine whether these two witnesses had been previously convicted of felonies. Regardless, Mr. Bowers, through his *633 cross-examination, adequately raised issues and tested the credibility of these witnesses. Therefore, the Court finds that this failure to impeach them on prior felony convictions, if such existed, was not ineffective.
[[Image here]]
“(9) [Sheffield] alleges that Mr. Bowers was ineffective in failing to object to, and preserve for appeal, the admission into evidence of only a portion of a taped telephone conversation between Sheffield and John Windham which, taken out of context, was misleading to the jury. The Court finds that this argument is wholly without merit.
“(10) [Sheffield] argues that Mr. Bowers was ineffective in failing to elicit exculpatory information from State’s witness, Tiffany Cooper, either on cross-examination or in calling her as a defense witness. The Court finds that this allegation is without merit.
“(11) [Sheffield] alleges that Mr. Bowers was ineffective in failing to ask that the jury be instructed that Erica Criswell’s prior statement given to law enforcement can only be considered to impeach her credibility and cannot be considered for the truth the matter asserted. The Court finds that this argument is without merit.
“(12) [Sheffield] claims that Mr. Bowers was ineffective in that he was generally unprepared for trial. The Court finds that this allegation is without merit as well. As previously stated in this order, this Court has tried many, many cases with Mr. Bowers over the years. Although in hindsight, a defense attorney may well be able to do more if he or she had a staff of investigators and law clerks, that is not necessary to render effec-five assistance of counsel. Mr. Bowers was not unprepared for the trial of this case and in fact did an excellent job in representing Mr. Sheffield.
“In summary, the Court finds that defense trial counsel in this case was not ineffective in his representation of Mr. Sheffield. Mr. Bowers’ performance was not deficient. Even, with the benefit of hindsight, someone might determine that its performance was in some areas deficient, Mr. Sheffield was in no way prejudiced.”
(C. 204-09.)
“ ‘In order to prevail on a claim of ineffective assistance of counsel, a defendant must meet the two-pronged test articulated by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):
“ ‘ “First, the defendant must show that counsel’s performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the ‘counsel’ guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel’s errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.”
“ ‘466 U.S. at 687, 104 S.Ct. at 2064.
“ ‘ “The performance component outlined in Strickland is an objective one: that is, whether counsel’s assistance, judged under ‘prevailing professional norms,’ was ‘reasonable con *634 sidering all the circumstances.’ ” Daniels v. State, 650 So.2d 544, 552 (Ala.Cr.App.1994), cert. denied, [514 U.S. 1024, 115 S.Ct. 1375, 131 L.Ed.2d 230 (1995) ], quoting Strickland, 466 U.S. at 688, 104 S.Ct. at 2065. “A court deciding an actual ineffectiveness claim must judge the reasonableness of counsel’s challenged conduct on the facts of the particular case, viewed as of the time of counsel’s conduct.” Strickland, 466 U.S. at 690, 104 S.Ct. at 2066.
“ ‘The claimant alleging ineffective assistance of counsel has the burden of showing that counsel’s assistance was ineffective. Ex parte Baldwin, 456 So.2d 129 (Ala.1984), aff'd, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985). “Once a petitioner has identified the specific acts or omissions that he alleges were not the result of reasonable professional judgment on counsel’s part, the court must determine whether those acts or omissions fall ‘outside the wide range of professionally competent assistance.’ [Strickland,] 466 U.S. at 690, 104 S.Ct. at 2066.” Daniels, 650 So.2d at 552. When reviewing a claim of ineffective assistance of counsel, this court indulges a strong presumption that counsel’s conduct was appropriate and reasonable. Hallford v. State, 629 So.2d 6 (Ala.Cr.App.1992), cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 491 (1994); Luke v. State, 484 So.2d 531 (Ala.Cr.App.1985).
“This court must avoid using ‘hindsight’ to evaluate the performance of counsel. We must evaluate all the circumstances surrounding the case at the time of counsel’s actions before determining whether counsel rendered ineffective assistance.” Hallford, 629 So.2d at 9. See also, e.g., Cartwright v. State, 645 So.2d 326 (Ala.Cr.App.1994).
“ ‘ “Judicial scrutiny of counsel’s performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel’s assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel’s defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.”
“‘Strickland, 466 U.S. at 689, 104 S.Ct. at 2065 (citations omitted). See Ex parte Lawley, 512 So.2d 1370, 1372 (Ala.1987).
“ ‘ “Even if an attorney’s performance is determined to be deficient, the petitioner is not entitled to relief unless he establishes that ‘there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A *635 reasonable probability is a probability sufficient to undermine confidence in the outcome.’ [Strickland.,] 466 U.S. at 694, 104 S.Ct. at 2068.”
“ ‘Daniels, 650 So.2d at 552.
Dobyne v. State, 805 So.2d 783, 742-43 (Ala.Crim.App.2000), aff'd, 805 So.2d 763 (Ala.2001). See also Nicks v. State, 783 So.2d 895, 918-919 (Ala.Crim.App.1999).
Sheffield claims that his trial counsel was ineffective because he failed to move for judgment of acquittal on the specific ground that the State failed to prove universal malice. Sheffield also claims that his trial counsel was ineffective because he failed to object to the admission into evidence of extrajudicial confessions or incul-patory statements before the State established the corpus delicti of the offenses charged. Sheffield next claims that his trial counsel was ineffective because he failed to object to the State’s evidence produced at trial as varying from the charged offense of reckless murder and constituting a constructive amendment to the indictment.
Because these ineffeetive-assistance-of-counsel Claims are interrelated or are disposed of above, we address them together. As to the ineffectiveness claims relative to the reckless-murder conviction, we conclude those claims are moot in light of our disposition in Part II.A. of this opinion, vacating that conviction. Regarding the reckless-manslaughter convictions, and the issue whether trial counsel was ineffective for failing to object to the admission into evidence of extrajudicial confessions or in-culpatory statements before the State established the corpus delicti of the offenses charged, because of our disposition in Part II.B. of this opinion, it is without merit. As discussed above, by the time Joe Courtney’s testimony was presented to the jury, it was established that Chucky Morrow and Main Man Morrow had died as a result of the fire. Additionally, other evidence pointed to Sheffield as the one who set the fire. Therefore, the State, in fact, presented some evidence of material elements of the offenses before presenting Sheffield’s confessions or inculpatory statements to Courtney, Cooper, and others. Moreover, as we indicated above, the fact that some evidence of Sheffield’s admissions was presented before the corpus delicti was proven was cured by later proof. Thus, as there was no corpus de-licti error, Sheffield’s counsel could not have been ineffective by failing to raise this issue before the evidence of Sheffield’s extrajudicial confessions or inculpatory statements. Consequently, Sheffield has not shown error.
A.
Sheffield next argues that his trial counsel was ineffective because he failed to ensure that the jury was properly charged. More particularly, he claims trial counsel should have ensured that the jury was properly charged on universal malice. He also claims error because, he says, trial counsel was ineffective “in failing to request a limiting instruction informing the jury that they could only consider Erica Criswell’s prior inconsistent statement to law enforcement to impeach her credibility as a witness.” (Sheffield’s brief at pp. 85-86.) He also argues that trial counsel was ineffective for failing to ask for a jury instruction that a fire is presumed to be accidental.
As to the ineffective-assistanee-of-counsel claim relating to the universal-malice jury charge, the record shows that the trial court’s instruction on reckless murder substantially tracks the Alabama Pattern Jury Instructions and is a correct statement of the law. (R. 343-46.) The failure of counsel to object to a correct jury charge cannot be considered deficient *636 performance or prejudicial to the defendant. See Russo v. State, 630 So.2d 142, 144 (Ala.Crim.App.1998) (“[T]his court has recognized that defense counsel’s failure either to request or object to jury instructions, even if that failure is determined to be error, will not always constitute reversible error.”). See also Ex parte Hagood, 777 So.2d 214 (Ala.1999). Thus, Sheffield’s counsel was not ineffective for not objecting to this instruction.
Next, regarding the limiting instruction with respect to the ineffectiveness claim relating to the impeachment testimony, this Court has held that “prior inconsistent statements of a witness may be used to impeach the credibility of the witness but, generally, may not be considered as substantive evidence.” Varner v. State, 497 So.2d 1135, 1137 (Ala.Crim.App.1986). Furthermore, the trial court does not have a duty, sua sponte, to inform the jury that evidence of inconsistent statements may be considered only for the purpose of impeaching a witness’s credibility. Varner; Weaver v. State, 466 So.2d 1037 (Ala.Crim.App.1985). Instead, counsel must request any cautionary or limiting instructions. See Varner, supra. However, the decision not to request a limiting instruction is a matter of trial strategy and does not establish ineffective assistance of counsel. See, e.g., Jones v. State, 280 Ga. 205, 207, 625 S.E.2d 1, 3 (2005) (“[t]he decision of criminal defense counsel not to request limiting instructions is presumed to be strategic”). The record shows that Criswell’s prior inconsistent statement to law-enforcement officials in late July 2007 was not played for the jury or admitted into evidence. Further, there was limited evidence at the hearing on the motion for a new trial regarding trial counsel’s strategy in this regard, and, at that hearing, Sheffield did not question his trial counsel as to why counsel chose not to request a limiting instruction. To hold that trial counsel was ineffective based on the asserted ground would call for speculation, which we will not do. See Cummings v. State, 687 So.2d 1290, 1291 (Ala.Crim.App.1996) (inmate’s ineffective-assistanee-of-counsel claim could not be resolved from the limited record before the appellate court). See also Robitaille v. State, 971 So.2d 43, 73 (Ala.Crim.App.2005); Burgess v. State, 962 So.2d 272, 280 (Ala.Crim.App.2005); Brooks v. State, 929 So.2d 491, 497 (Ala.Crim.App.2005); Williams v. Head, 185 F.3d 1223, 1236 (11th Cir.1999). Therefore, Sheffield has not shown that his trial counsel’s performance was deficient under Strickland on this ground.
As to Sheffield’s claim that his trial counsel was ineffective for failing to request a jury instruction that it is presumed that the fire occurred from accidental causes, we likewise conclude that Sheffield failed to show that trial counsel’s performance was deficient. Again, at the hearing on the motion for a new trial, Sheffield did not question his trial counsel as to why counsel chose not to request an instruction that there is a presumption that a fire occurred from accidental causes. We cannot find error on the limited record before us. See Cummings, supra. Accordingly, Sheffield has failed to demonstrate in any manner that trial counsel did not exercise reasonable professional judgment in handling the jury instructions.
B.
Sheffield next argues that his trial counsel was ineffective because he failed to object to only a portion of a recording of the jailhouse telephone call between Sheffield and a man unrelated to this case being admitted into evidence and played for the jury because the recording was misleading to the jury. He contends that trial counsel should have requested that *637 the entire telephone conversation be played for the jury or that no portion at all should have been played.
At the motion for new trial hearing, Sheffield’s trial counsel testified regarding the admitted portion of the taped conversation, and the following exchange occurred:
“Q. Tell us a little bit about that, how the decision came to be made that a portion of the tape would be played for the jury and a portion would not.
“A. Because the taped conversations— if I recall, the taped conversation contained conversations about an unrelated incident in a different county that was a fire that had taken place in another county that was similar to this. I did not want to have the jury listening to information about a second fire that Mr. Sheffield might have been involved in, because I did not want that to influence their decision in this ease. It was an unrelated incident. But it’s been my experience that juries tend to — when they hear something, once they hear it, you can’t erase it. So if they hear stuff that’s unrelated, they still retain that information. So I was trying to keep that separate.
The District Attorney and I met on several occasions about that and they redacted those portions from the tape. And the Court instructed the jury that there were portions of the tape that were — had been redacted and they were not to concern themselves with that redaction because it was unrelated to this case. And we were trying to narrow the evidence down to just this case. That’s my — and, in fact, there was even an instruction prepared by the District Attorney’s Office, Mr. Houts, that reflected that. And the Court used that instruction, I believe, in its instructions.
[[Image here]]
“Q. (BY MS. BUCK) Mr. Bowers, were you — were you concerned that the portion that was played for the jury might be taken out of context though if they didn’t hear the rest? Let me ask you; did you object to it going in at all? I mean, did you make a blanket objection to them hearing the recording, if you recall?
“A. I don’t recall. I would have to defer to whatever the record said.
“Q. But it would have been a matter of concern that if they only heard the portion that had to — and I will represent to you that the portion had to do with the defendant suggesting to someone that they drug and get drunk the State’s star witness, if the jury heard that and nothing else without the context, were you concerned that they might take it out of context and take it to suggest that the defendant is trying to tamper with a State witness or something else improper?
“A. I didn’t understand the first part of your question. But I was not concerned with the portions of the tape being entered, because I was confident that — with Judge Bush and his instructions....
[[Image here]]
“THE COURT: Well, this kind of goes back to the discussion that the Court had with counsel in this case, that we did not want the jury — you know, I felt like it was extremely prejudicial to Mr. Sheffield for the jury to hear that he was accused of burning somebody’s trailer down in Marengo County. And *638 we — and I said we’re not going to get there. We’re not going to try this other case. It’s not relevant in this case. And it’s not any more relevant today than it was then. All I do know is that if I had allowed that to come in and Mr. Bowers had allowed that to go in, in my humble experience, I don’t know how the jury could not hold that against Mr. Sheffield and not believe that he had burned somebody else’s trailer down, so dadgum it, he burned this house down. That’s why it ain’t in, okay, plain and simple. Let’s move on, please.”
(R. 394-400.)
Strickland cautions that “there are countless ways to provide effective assistance in a given case” and that “even the best criminal defense attorneys would not defend the particular client the same way.” 466 U.S. at 689. Defense counsel here clearly made the tactical decision that the jury hear only a portion of the taped telephone conversation. Counsel’s decision appears reasonable because, as the trial judge indicated, the remainder of the conversation which concerned a fire in another county in which Sheffield was allegedly involved, was highly prejudicial to Sheffield. Further, the record discloses that the trial judge instructed the jury about the taped telephone conversation. (C. 32; 354-55.) See, e.g., State v. Riffle, 110 Ohio App.3d 554, 557-58, 674 N.E.2d 1214, 1216 (1996) (holding that the failure of defense counsel to move for a mistrial, following the playing for the jury of a taped conversation between parents of victim that had not been heard in open court, did not equate to ineffective assistance of counsel because it was a tactical decision not to request a mistrial, and the defendant was not prejudiced by counsel’s failure to request a mistrial as a result of the court’s instruction to the jury to disregard any portion of the tape that had not been played in open court, curing any error that may have arisen from the jury’s playing of entire tape during its deliberations). Additionally, while objecting to the admission of the entire conversation might have been a better course, trial counsel may have declined to do so to avoid unduly drawing the jury’s attention to the matter by suggesting the remainder of the tape was especially harmful to the defense of the case. The reviewing court should not use hindsight to second-guess trial counsel’s strategy choices. See Ex parte Lawley, 512 So.2d 1370, 1372 (Ala.1987); Williams v. State, 641 So.2d 1305, 1308 (Ala.Crim.App.1994) (“This was a decision of strategy, and we cannot, in hindsight, second-guess such decisions by trial counsel.”); Hallford v. State, 629 So.2d 6, 9 (Ala.Crim.App.1992). Sheffield has not shown his trial counsel’s failure to object was not part of his trial strategy. See, e.g., People v. Riel, 22 Cal.4th 1153, 96 Cal.Rptr.2d 1, 998 P.2d 969, 991-92 (2000) (holding that trial counsel was not ineffective for failing to object on relevance grounds to the admission of surreptitious tape-recording by jail officials of conversation between the defendant, his mother, and his sister, which took place in the jail visiting room while the defendant was awaiting trial, because at least a portion of it was clearly relevant, and counsel made a permissible tactical decision that if the jury heard any part of conversation, it should hear all of it); State v. Riffle, 110 Ohio App.3d at 557-58, 674 N.E.2d at 1216 (“The failure to object is not a per se indicator of ineffective assistance of counsel because counsel may refuse to object for tactical reasons.”). Because we presume that counsel’s conduct falls within the range of reasonable professional assistance, counsel’s trial tactics generally do not suffice to support an ineffective-assistance claim. See Hooks v. State, 21 So.3d 772, 793 (Ala.Crim.App. 2008), citing Grayson v. Thompson, 257 *639 F.3d 1194, 1218 (11th Cir.2001); Ex parte Lawley. Therefore, Sheffield has failed to demonstrate the first prong of Strickland — that in failing to object, his trial counsel performed deficiently. Accordingly, we find no error.
C.
Sheffield next argues that his trial counsel was ineffective because he failed to impeach two State’s witnesses, Joe Courtney and Lisa London, with their prior felony convictions.
As to the prior felony convictions, the following exchange occurred at the hearing on the motion for a new trial:
“Q. Were you aware of these prior convictions of the State’s witnesses?
“A. No, I was not. If it was not contained in the State’s discovery that was provided to me, I was not aware of it.
“Q. Okay. If you had been aware that the State’s witnesses had prior convictions, would you have used those to impeach their credibility at trial?
“A. If I had had that information and if I had thought that it would have been something that I could have used to help Mr. Sheffield in his defense, I would have pursued that. I was informed by Mr. Sheffield about one lady and her prior convictions or pending convictions. And he and I did go pull that record and I did question that witness about that information on the stand. And she testified to that and basically gave — did not deny it and said, ‘Yes, I had those convictions and I’m still paying,’ et cetera. So we really couldn’t go much further with that. I believe that was — that may be Ms. Tiffany Cooper, but I’m not sure. I can’t find that in my file here.
“Q. Okay.
“A. But not Courtney and the other lady.
“Q. All right. I think we can move on.”
(R. 401-02.)[9]
Initially, we recognize that a defendant is not entitled to the general disclosure of the criminal records of the State’s witnesses. See State v. Stallworth, 941 So.2d 327, 336 (Ala.Crim.App.2006), and the cases cited therein. The record discloses that defense counsel did question Lisa London about bad-check convictions, but he did not question her about any felony convictions because, as he testified at the hearing on the motion for a new trial, he was unaware of any such convictions. Defense counsel also testified'at the motion for new trial hearing that he did not know of Joe Courtney’s convictions. The record shows that defense counsel attacked London about not coming forward with her knowledge of the fire until 2009, after Sheffield had been indicted. The record also shows that defense counsel attempted to impeach Courtney by showing bias based on an altercation that occurred between Sheffield and Courtney over some tools Courtney believed Sheffield had stolen from him. Defense counsel also called a witness to testify about Sheffield and Courtney’s disagreement. Further, how to conduct cross-examination is a strategic and tactical decision left to the discretion of counsel. See Dorsey v. Chapman, 262 F.3d 1181, 1185-86 (11th Cir.2001), cert. denied 535 U.S. 1000, 122 S.Ct. 1567, 152 L.Ed.2d 489 (2002); Fugate v. Head, 261 F.3d 1206, 1219 (11th Cir. 2001), quoting Messer v. Kemp, 760 F.2d 1080, 1090 (11th Cir.1985); Phillips v. State, 277 Ga. 161, 163, 587 S.E.2d 45, 47 *640 (2003); State ex rel. Daniel v. Legursky, 195 W.Va. 314, 328, 465 S.E.2d 416, 430 (1995). Here, trial counsel’s strategy was to prevent evidence from coming in relating to other fires in which Sheffield was allegedly involved. Additionally, defense counsel used impeachment evidence that he was aware of against State’s witness, London. Sheffield has failed to show that, had these witnesses been impeached, the result of his trial would have been different. In order to establish the prejudice prong of Strickland, a petitioner must show at least one “specific instance where cross-examination arguably could have affected the outcome of ... trial.” Fugate, 261 F.3d at 1219, quoting Messer, 760 F.2d at 1090. Thus, Sheffield is not entitled to relief on this claim.
D.
Sheffield also argues that his trial counsel was ineffective because he failed to procure favorable testimony from Tiffany Cooper, Sheffield’s girlfriend at the time of the fire.
Sheffield claims that had trial counsel thoroughly questioned Cooper or called her as a defense witness she would have contradicted Ida Morrow’s testimony about the pit-bull dog found on Sheffield’s porch on the morning of the fire; she would have testified that Sheffield did not give her Xanax on the night before the fire as one of the State’s witnesses claimed; she would have testified that, when she left for work on the morning of the fire, before 7:30 a.m., Sheffield was still in bed, which coupled with other testimony, would have made it unlikely that he set the fire.
As indicated above, cross-examination is a strategic and tactical decision left to the discretion of counsel. See Dorsey; Fugate; Legursky. Further, “[t]he decision [to call or] not to call a particular witness is usually a tactical decision not constituting ineffective assistance of counsel.” Oliver v. State, 435 So.2d 207, 208-09 (Ala.Crim.App.1983). ‘““This Court will not second-guess tactical decisions of counsel in deciding whether to call certain witnesses.” United States v. Long, 674 F.2d 848, 855 (11th Cir.1982).’ Oliver v. State, 435 So.2d 207, 208-09 (Ala.Cr.App.1983).” Falkner v. State, 462 So.2d 1040, 1041-42 (Ala.Crim.App.1984). See Smith v. State, 756 So.2d 892, 910 (Ala.Crim.App.1997), affd, 756 So.2d 957 (Ala.2000) (“[I]t is not our function to second-guess the strategic decisions made by counsel.”). Such strategic decisions “are virtually unassailable.” McGahee v. State, 885 So.2d 191, 222 (Ala.Crim.App.2003). See Slaton v. State, 902 So.2d 102, 124 (Ala.Crim.App.2003).
We hold that Sheffield’s ineffective-assistance-of-counsel claims are meritless because he has failed either to show error or to show prejudice or to show as erroneous the trial court’s determination that Sheffield’s assistance of counsel at trial was ineffective. Thus, because Sheffield has not shown either a deficiency by trial counsel or any prejudice from counsel’s performance, the trial court correctly denied Sheffield’s motion for new trial on the ineffective-assistance-of-counsel claims. Accordingly, Sheffield is entitled to no relief on his ineffeetive-assistance-of-counsel claim.
V.
Lastly, Sheffield contends the trial court erred in failing to compel Tiffany Copper’s appearance at the hearing on the motion for a new trial. The State counters that Cooper’s testimony was not material at the hearing and that the denial of a continuance to secure her presence did not materially prejudice Sheffield.
*641 The right of a trial court to compel a witness by attachment is not an absolute and unqualified right; rather it is a matter within trial court’s discretion. Cannon v. State, 416 So.2d 1097, 1100 (Ala.Crim.App.1982). “A motion for continuance is addressed to the sound discretion of the trial court, the exercise of which will not be disturbed unless clearly abused. Pritchett v. State, 445 So.2d 984 (Ala.Crim.App.1984); Weaver v. State, 401 So.2d 344 (Ala.Crim.App.1981); Bailey v. State, 898 So.2d 406 (Ala.Crim.App.1981). This rule also applies to cases in which the continuance is based on an absent witness. Pritchett; Weaver; Bailey.” Holton v. State, 590 So.2d 914, 917 (Ala.Crim.App.1990), aff'd, 590 So.2d 918 (Ala.1991).
It is well settled that the Sixth Amendment of the United States Constitution and Art. I, § 6, Alabama Constitution of 1901, affords, in pertinent part, an accused the right “to have compulsory process for obtaining witnesses in his favor.” However, in Smith v. State, 698 So.2d 189 (Ala.Crim.App.1996), this Court stated:
“To warrant a continuance on the ground that a witness is absent, it must be shown that the expected testimony of the witness is material and competent, that there is a probability that the evidence will be forthcoming if the case is continued, and that the moving party exercised due diligence to secure the evidence. Ex parte Saranthus, 501 So.2d 1256 (Ala.1986).... It must be shown that substantially favorable testimony would be given by the witness and that the denial of a continuance would materially prejudice the defendant. Whitehead v. State, 429 So.2d 641 (Ala.Cr.App.1982). In addition, it must be established that the expected testimony is not merely cumulative or in the nature of impeachment, and the motion for a continuance must not be made merely for purposes of delay. Mitchell v. Moore, 406 So.2d 347 (Ala.1981); Malone v. State, 659 So.2d 1006 (Ala.Cr.App.1995); McClellan v. State, 628 So.2d 1026 (Ala.Cr.App.1993); Prince v. State, 623 So.2d 355 (Ala.Cr.App.1992).”
698 So.2d at 205. Additionally, Rule 17.5, Ala.R.Crim.P., provides that “[a]ny witness who, after being subpoenaed, fails to appear at the time and the place as required by the subpoena, or who fails to remain until released, may be attached by order of the court.”
In Weaver v. State, 401 So.2d 344 (Ala.Crim.App.1981), this Court stated:
“ ‘Before it can be said that the accused has been denied this constitutional right, he must apply to the court for the issuance of an attachment and show to the court that the witness has been served with a subpoena a sufficient length of time before the trial to afford an opportunity to the witness to obey its mandate, that the witness is within the jurisdiction of the court, and that his attendance can be obtained within a reasonable time by the compulsory process, that such witness is absent without the procurement or consent of the accused, and that the testimony of the witness is material....’”
401 So.2d at 349, quoting Thomas v. State, 15 Ala.App. 408, 73 So. 558 (1916).
At the hearing on the motion for a new trial, Sheffield’s counsel informed the court that Cooper had been served with a subpoena to testify but had failed to appear. The circuit clerk indicated that Cooper had contacted the clerk’s office and stated that she had been served, but that she would not be able to get to the hearing from Mobile. Sheffield’s counsel then stated that Sheffield’s mother had offered to drive Cooper from Mobile to Chilton County and, at first, Cooper was agreeable to that but, before the hearing, had informed Sheffield’s mother that she was not going to be able to attend the hearing. (R. 378-79.) Counsel then proffered what testimo *642 ny Cooper would provide and requested a writ of attachment to compel her to comply with the subpoena. The trial judge refused to issue the writ of attachment or continue the hearing. Specifically, the trial judge said:
“THE COURT: I’m sorry, I’m having a hard time understanding how this is material on whether I should grant — set aside these verdicts and sentence and give him a new trial. I’m having a hard time understanding what — all I’ve heard is stuff that somebody might have said something about that may be impeachment at best. And I’m kind of missing how it’s material and why I should stop what I’m doing to go get a witness that I’m not so sure what she’s really got to do with the arguments that I’ve got to address here. I mean, I don’t understand.
[[Image here]]
“THE COURT: I’m not going to put this hearing off and send somebody to Mobile to get somebody that could offer or not offer testimony that, in my humble opinion, does not affect what I’m here for right now.”
(R. 383-84.)
In this case, the testimony, as proffered, was not material. The defense stated that Cooper was going to testify that Sheffield gave her Xanax the night of the fire. However, the State never offered as proof that Cooper was given Xanax the night before the fire. Instead, other witnesses indicated that Sheffield informed them that he gave Chucky Morrow Xanax the night before the fire and there was some mention that he gave both Cooper and Chucky Morrow Xanax. Additionally, the record shows that Criswell vehemently denied that Sheffield told her he gave Cooper Xanax the evening before the fire. Cris-well’s prior inconsistent statement, in which she indicated that Sheffield told her he gave Cooper Xanax, was not introduced or admitted into evidence. Courtney did not testify at trial that Sheffield told him he gave Cooper Xanax. Likewise, Ida Morrow was not questioned at trial about the inconsistencies in her recollection of her conversation with Sheffield and Cooper’s recollection of that conversation. There is no indication that Cooper would have testified to anything that was material. Here, because the witness’s • absence was not the result of any failure by the circuit clerk or authorities, because the proffered testimony was tenuous at best, because there is no reasonable assurance that the witness would have even testified as defense counsel proffered, Sheffield has failed to show that Cooper’s testimony was material or that he was prejudiced by the trial court’s refusal to compel Cooper to comply with Sheffield’s subpoena. Thus, we cannot say that Sheffield was denied his constitutional right to compulsory process by the trial court’s rulings. We cannot find that the trial court abused its discretion.
Accordingly, for the reasons stated above, we reverse Sheffield’s conviction for reckless murder (count I) and remand this case for the trial court to enter a judgment finding Sheffield guilty of reckless manslaughter consistent with this opinion. We affirm Sheffield’s conviction for reckless manslaughter (count II).
AFFIRMED AS TO CONVICTION AND SENTENCE FOR RECKLESS MANSLAUGHTER (COUNT II); REVERSED AS TO CONVICTION FOR RECKLESS MURDER (COUNT I); AND REMANDED WITH INSTRUCTIONS.
WISE, P.J., and WELCH, WINDOM, and KELLUM, JJ., concur.

. Throughout the opinion, we refer to the victims as "Chucky Morrow” and "Main Man Morrow.”

. Lisa London was married in December 2003 and was known as Lisa Fells. Her husband died and in portions of the record she is referred to as Lisa Wilcox. For pur *614 poses of the opinion, we refer to her as "Lisa London.”

. The trial court charged the jury on murder, manslaughter, and criminally negligent homicide.

. We need not determine whether the verdicts in this case were inconsistent. See Heard, supra.

. Claim I in Sheffield’s brief to this Court.

. Sheffield’s companion ineffective-assistance-of-counsel claims are moot in view of the reversal of his conviction.

. We recognize that Sheffield was not charged with arson.

. State's Exhibit 17. (R. 237-38.)

. Defense counsel appeared to be confused; Lisa London was the witness he questioned about prior offenses.